**HOOSIER HOME THEATER, INC.
d/b/a TVQ, a Delaware
Corporation, Plaintiff,**

v.

**Steven L. ADKINS, Defendant.**

**No. IP 83–1004–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Aug. 7, 1984.

Raymond W. Conley, General Counsel, Movie Systems, Inc., Des Moines, Iowa, Steven G. Cracraft, Salyers, Eiteljorg & Cracraft, Indianapolis, Ind., for plaintiff.

Christopher C. Zoeller, Indianapolis, Ind., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARKER, District Judge.

This case is before the Court on the motion for partial summary judgment pursuant to Rule 56(d), Federal Rules of Civil Procedure, filed by plaintiff on Counts I, II, and III of the complaint. The plaintiff and defendant stipulate that there are no genuine issues of material fact with respect to the issues relating to liability. However, there are remaining facts in controversy with respect to the issue of damages, assuming a finding of liability. Accordingly, the issues relating to specific remedies are not reached or resolved by this ruling on the motion for partial summary judgment.

Based upon the stipulations of undisputed facts, the briefs and oral argument of counsel, the Court now submits its findings of fact and conclusions of law. In accordance therewith, plaintiff's motion for partial summary judgment is GRANTED IN PART and DENIED IN PART.

### Findings of Fact

1. Plaintiff, Hoosier Home Theater, Inc. d/b/a TVQ ("TVQ"), is a Delaware corporation and a wholly-owned subsidiary of Movie Systems, Inc. TVQ is duly qualified and admitted to do business in the State of Indiana as a foreign corporation, and is a citizen of the State of Indiana by virtue of maintaining its principal place of business at 5937 West 71st Street, Indianapolis, Indiana 46278. Defendant, Steven L. Adkins ("Adkins") is a resident of the State of Indiana, residing at 6319 West Castle Avenue, Indianapolis, Indiana.

2. TVQ is engaged in the business, among other things, of marketing and delivering to its subscribers in the Southern District of Indiana a commercial-free, paid television service, which features uncut motion pictures, sporting events and other forms of video entertainment programming, which programming is, therefore, distinguishable from that offered by the major national commercial television networks.

3. All of the programming which TVQ currently delivers to its subscribers as a part of its television entertainment service is provided by Home Box Office, Inc. ("HBO").

4. HBO has granted an exclusive license to TVQ to market, sell, and deliver HBO's programming as a television entertainment service by microwave transmission to residents in a portion of the Southern District of Indiana.

5. HBO currently originates the program which it provides for TVQ's television entertainment service from HBO studios in New York, New York.

6. HBO transmits programming for its television entertainment service from the studios by wire (New York Telephone Company and Manhattan Cable Corporation) to Radio Corporation of America ("RCA") Television Operations Center microwave transmitter in New York, New York.

7. Both New York Telephone Company and Manhattan Cable Corporation are common carriers as that term is defined by the Federal Communications Commission ("FCC").

8. RCA relays the programming from its Television Operations Center microwave transmitter through a "3-hop" microwave wave length to a microwave "up link" transmitter at Vernon Valley, New Jersey.

9. The programming is relayed from the "up link" transmitter to a RCA-American satellite at microwave radio frequency [6235 Megahertz ("MHz")]. The programming is then relayed from the satellite to a "down link" receiver near Morristown, Indiana, at a microwave radio frequency (4100 MHz).

10. RCA is a common carrier.

11. The programming is transmitted from the "down link" receiver by "one-hop" microwave length to a microwave receiver atop the Indiana National Bank tower in Indianapolis, Indiana, at microwave radio frequency (approximately 11,000 MHz).

12. The "one-hop" microwave length is operated by Video Services, Inc., which is a common carrier.

13. The programming is transmitted by wire from the receiver to a transmitter atop the Indiana National Bank tower.

14. The transmitter atop the Indiana National Bank tower is operated by Microband Corporation of America ("Microband"), which is a common carrier.

15. The FCC licenses Microband to transmit in the greater Indianapolis metropolitan area at microwave radio frequency (2150–2162 MHz). The FCC licenses Microband to transmit an omni-directional signal, and Microband's FCC license is denominated a multipoint distribution service ("MDS"). Microband's MDS is licensed for the express purpose of carrying for-hire private communications.

16. TVQ has contracted with Microband and "subscribes" to Microband's MDS in the greater Indianapolis metropolitan area. Under the terms of the contract between TVQ and Microband and under the terms of Microband's tariff, TVQ pays a monthly fee to Microband for Microband's MDS in the greater Indianapolis metropolitan area. TVQ uses Microband's MDS to distribute TVQ's television entertainment service in the Southern District of Indiana. Microband's MDS carries one way, subscriber supplied communications from the stationary transmitter atop the Indiana National Bank tower to multiple fixed points designated by TVQ, the subscriber.

17. Microband distributes TVQ's programming at microwave radio frequencies (2150–2156 MHz).

18. A standard television set is currently designed to receive transmissions at very high frequencies ("VHF") (54–216 MHz) (channels 2–13) and at ultra high frequencies ("UHF") (470–844 MHz) (channels 14–83).

19. Because of the higher frequencies of Microband's MDS transmissions, Microband's MDS transmissions cannot be received by such a standard television set without the use of additional equipment.

20. A microwave antenna and down converter are required to receive Microband's MDS signal and down convert or demodulate that signal to a VHF frequency so that the signal can be received and displayed in an intelligible form on such a standard television set.

21. Successful reception and use of Microband's MDS in certain portions of the Southern District of Indiana requires a clear or line-of-sight transmission path from the transmitter atop the Indiana Na-

tional Bank tower to the fixed reception point.

22. TVQ normally provides its fee-paying subscribers with the receiving equipment necessary to receive and down convert Microband's MDS microwave transmission for reception on the subscribers' standard television set.

23. TVQ provides equipment to its subscribers that is fined-tuned to receive transmission at 2150–2156 MHz, and the equipment is installed so as to be in line with the transmitter atop the Indiana National Bank tower and with a clear transmission path.

24. The transmissions originating at the HBO studios in New York, New York, proceed uninterrupted to the ultimate receiver and user in and around the Indianapolis metropolitan area; however, the signal is transmitted via a combination of means such as wire, cable, satellite, light and radio transmissions.

25. TVQ subscribers normally pay TVQ an installation charge, a generally refundable deposit for the receiving equipment and a monthly charge for the television entertainment service.

26. TVQ's principal source of revenue for providing its television entertainment services is the monthly fees paid by subscribers.

27. As part of its service, TVQ maintains a staff of servicemen who perform equipment maintenance and servicing for most of its subscribers at no additional charge.

28. TVQ pays HBO a monthly fee for the programming which HBO provides.

29. TVQ has undertaken an advertising campaign to promote its television entertainment service in the Southern District of Indiana.

30. Steven L. Adkins at all times pertinent to this litigation was a resident of the State of Indiana, residing at 6319 West Castle Avenue, Indianapolis, Indiana.

31. Steven L. Adkins received and used at his residence TVQ's home entertainment service microwave signal transmitted from the top of the Indiana National Bank building for approximately three (3) months during the period from November 1, 1981, to January 30, 1982.

32. Steven L. Adkins assembled equipment necessary to receive TVQ's signal from standard electronic parts readily available in most electronic stores.

33. Steven L. Adkins assembled the equipment for the sole purpose of receiving and using TVQ's signal.

34. Steven L. Adkins was never authorized by TVQ to receive and use the signal, and Adkins was never a paying subscriber of TVQ.

35. TVQ only intends its signal to be received and used by its paying subscribers.

36. Any conclusion of law stated below, to the extent that it constitutes a finding of fact, is herein incorporated by reference as an additional finding of fact by the Court.

*Conclusions of Law*

1. The Court has jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C. § 1331(a) and § 1337(a) and pursuant to its pendant and ancillary jurisdiction.

2. Count I of this action asserts a claim pursuant to Section 605 of the Communications Act of 1934, 47 U.S.C. § 605, which states in applicable part as follows:

"No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication ·to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.... This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is transmitted by any

station for the use of the general public ...."

47 U.S.C. § 605 (Supp.1983).

3. Count II of this action asserts a claim pursuant to Title 18 United States Code § 2511 and § 2520, the "wiretap" statutes, which provisions state as follows:

"§ 2511. Interception and disclosure of wire or oral communications prohibited

(1) Except as otherwise specifically provided in this chapter [18 USCS §§ 2510 et seq.] any person who—

(a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.

§ 2520. Recovery of civil damages authorized

Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter [18 USCS §§ 2510 et seq.] shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and (2) be entitled to recover from any such person—

(a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

(b) punitive damages; and

(c) a reasonable attorney's fee and other litigation costs reasonably incurred.

A good faith reliance on a court order or legislative authorization shall constitute a complete defense to any civil or criminal action brought under this chapter [18 USCS §§ 2510 et seq.] or under any other law.

4. Count III of this action asserts a claim pursuant to I.C. 35-43-4-2, I.C. 35-43-4-3, and I.C. 35-43-5-3(a)(6), and I.C. 34-4-30-1, which provisions state as follows:

"35-43-4-2 Theft; receiving stolen property

Sec. 2. (a) A person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a Class D felony.

(b) A peson who knowingly or intentionally receives, retains, or disposes of the property of another person that has been the subject of theft commits receiving stolen property, a Class D felony....

"35-43-4-3 Conversion

Sec. 3. A person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion, a Class A misdemeanor....

"35-43-5-3 Deception

Sec. 3. (a) A person who:

\* \* \* \* \* \*

(6) with intent to defraud another person furnishing electricity, gas, water, telecommunication, or cable TV service, or any other utility service, avoids a lawful charge for that service by scheme or device or by tampering with facilities or equipment of the person furnishing the service;

"34-4-30-1 Offenses against property; damages; costs; attorney's fees

Sec. 1. If a person suffers a pecuniary loss as a result of a violation of IC 35-43, he may bring a civil action against the person who caused the loss for:

(1) an amount equal to three (3) times his actual damages;

(2) the costs of the action; and

(3) a reasonable attorney's fee."

5. Defendant answers with admissions and denials by asserting four affirmative defenses as follows:

First, that the defendant received, without solicitation on his part, the microwave signal which therefore is appropriately to be deemed a gift from HBO to the defendant entitling him to use and dispose of it in any manner he chooses;

Second, that there has been no "divulging" of any intercepted signal by the

defendant pursuant to 47 U.S.Code § 605;

Third, the defendant's actions have caused no damages to plaintiff; and

Fourth, that HBO's programming is no different than that of the major broadcast networks which, therefore, requires comparable, rather than preferential legal treatment.

5. A private right of action exists in favor of an aggrieved party under 47 U.S.C. § 605 for injuries arising out of a violation of that statute.

6. The use of the word "radio" in 47 U.S.C. § 605 includes television transmissions.

7. The term "broadcasting" is defined at 47 U.S.C. § 153(o) as meaning "the dissemination of radio communications intended to be received by the public."

8. TVQ is not a "broadcaster" under 47 U.S.C. § 605.

9. The FCC has designated TVQ's multipoint distribution service as "non-broadcast" and has allocated the applicable frequencies "exclusively to common carriers."

10. Protection is provided by 47 U.S.C. § 605 for the transmission of signals by satellite and those which do not constitute a "broadcast or (transmission) ... for the use of the general public ...."

11. TVQ's transmissions are not intended to be "broadcast" pursuant to 47 U.S.C. § 605 because, when done legally, authority to receive and use the programming must be given by TVQ.

12. Assuming *arguendo* that TVQ's transmissions are a "broadcast," which they are not, it is not a broadcast or transmission for the use of the general public.

13. TVQ's transmissions are not a communication "intended to be received by the public" because TVQ intends that it be received only by subscribers who pay for that programming.

14. The TVQ transmissions are distinguishable from the major national commercial television networks who broadcast for the use of the general public.

15. Persons who receive and use TVQ's transmissions for their own benefit without authorization from TVQ are in violation of 47 U.S.C. § 605. More particularly, Steven L. Adkins violated Section 605 of the Communications Act of 1934, as amended, by using a microwave antenna and down converter to receive and use TVQ's television entertainment service for his personal benefit without the permission or authorization of TVQ and without paying to TVQ its monthly subscription fee.

16. TVQ's transmissions, which were received and used by Steven L. Adkins, were not "wire communications" as that term is defined in 18 U.S.C. § 2510(1) for the reason that at the point at which Adkins acquired the signal it was not a communication transmitted by one party to another between a "point of origin connected to a point of reception" with which Adkins interfered. Rather, the signal had been dispersed from the top of the Indiana National Bank building into and through the air and at that point not carried along, by means of, or subject to a wire, cable, or other like connection to a specific receiver and prior to receipt by Adkins, the signal had not been received by anyone.

17. Steven L. Adkins did not "intercept" TVQ's transmissions as "intercept" is defined in 18 U.S.C. § 2510(4) because he did not aurally acquire the contents of any wire or oral communication, as that term is defined at 18 U.S.C. § 2510(1), since the signal, at the time it was received by Adkins, had come as an "unconnected" omnidirectional frequency capable of receipt by anyone possessing the required equipment, and TVQ had no protectable privacy interest in the signal prior to its being received.

18. The legislative history of 18 U.S.C. § 2510 *et seq.* (the "wiretap" statutes) establishes that the intent of this Act was to proscribe eavesdropping on "oral conversations (otherwise) made in *private,* without the consent of any of the *parties*

to such communications" and to protect "the privacy of individual thought and expression," and Steven L. Adkins, did not, by his receipt and use of TVQ's transmissions violate the privacy of wire and oral communications between any such parties without their consent. Omnibus Crime Control and Safe Street Act of 1968, (PL 90–351, Title III, 82 Stat. 211); *U.S. v. U.S. Dist. Ct. for Eastern Dist.* (1972), 407 U.S. 297, 302, 92 S.Ct. 2125, 2129, 32 L.Ed.2d 752.

19. Defendant Adkins did not violate Title 18 U.S.C. § 2511 and is not liable in damages to Plaintiff TVQ pursuant to Title 18 U.S.C. § 2520.

■ 20. Steven L. Adkins, by receiving and using a microwave antenna and down converter to receive and use TVQ's television entertainment service for his personal benefit without the permission or authorization of TVQ and without paying to TVQ its monthly subscription fee, was in violation of IC 35–43–5–3(a)(6), 35–43–4–3 and 35–43–4–2, and accordingly is liable to TVQ for damages pursuant to IC 34–4–30–1.

■ 21. TVQ is under no legal obligation to "scramble" its transmitted signals in order to hinder or prevent its receipt and use by unintended, unauthorized recipients such as the defendant.

■ 22. Adkins' first affirmative defense fails in light of the evidence that, in order to receive the TVQ signal, Adkins had to install the antenna and down converter to his existing television. That uncontroverted proof negates Adkins' premise that he received the signal "without solicitation on his part."

■ 23. Adkins' second affirmative defense fails because it is immaterial whether or not he "divulged" the signal upon its receipt since that is only one way in which 47 U.S.C. § 605 can be violated and it was established through uncontroverted evidence that the statute was violated in at least one other way, namely, by Adkins' unauthorized receipt and use of the signal for his own benefit.

24. Adkins' third affirmative defense was not raised or resolved by this motion for partial summary judgment and is, therefore, specifically reserved for subsequent consideration by the Court.

25. Adkins' fourth affirmative defense fails because of the Court's prior findings and conclusions to the contrary.

26. The law is with the plaintiff on all claims asserted in Counts I and III, but the law is with the defendant in Count II of the complaint.

27. TVQ is entitled to injunctive relief and money damages, if any should be proven, pursuant to 47 U.S.C. § 605, but the amount of money damages and the form of injunctive relief due, if any, is reserved for subsequent proceedings before the Court.

28. Any finding of fact stated above, to the extent that it constitutes a conclusion of law, is herein incorporated by reference as an additional conclusion of law by the Court.

## MEMORANDUM

Plaintiff, "TVQ," is in the business of providing for a fee television entertainment programming to residences and hotels in the Indianapolis metropolitan area. The actual programming is supplied by HBO in New York and through a series of linkages, by wire, satellite, radio and microwave transmissions, the signal is ultimately made available to the consumers. TVQ's specific role in the process relates to the last step in the transmission and delivery of the signal as the exclusive licensee of HBO to market and sell in Indianapolis the programming HBO has produced. TVQ's signal is an omnidirectional signal emanating from the top of the Indiana National Bank in downtown Indianapolis and is capable of being received within a fifteen mile straight-line radius by and through a system of antennae and converters into ordinary television sets.

TVQ subscribers ordinarily pay a fee to receive the programming which consists in the main of commercially uninterrupted

movies and sporting events. In addition, the TVQ subscribers pay an installation charge and a refundable deposit for the receiving equipment. The monthly fees are the primary source of revenue for TVQ.

This television entertainment service is subject to specific regulation by the FCC as a nonbroadcast function, not intended for the use of the general public. Each of the component links over, by and through which the transmission of the signals occurs is a common carrier and subject to FCC regulation as such. Though there are technical similarities between the way in which TVQ provides its programming and the way in which the national commercial television broadcasters provide theirs, they differ in their intended audience, their means of generating revenue, and their regulatory restraints.

The defendant, Mr. Adkins, installed his own antenna and downconverter and for a period of time used the equipment to receive TVQ's entertainment programs. Adkins did not pay the subscriber's fee to TVQ, did not pay the deposit to utilize TVQ's equipment, and was not authorized by TVQ to receive the programming.

The Court, in its afore-referenced Findings of Fact and Conclusions of Law, has found Adkins in violation of the Communications Act of 1934 and certain Indiana statutes relating to theft, conversion, and deception, but has found Adkins not liable under the "wiretap" statutes.

Applying the facts of this case to the Federal Communications Act (47 U.S.C. § 605) raises issues which are not novel and have been passed on in substance by many other courts. Furthermore, this Court is persuaded by the clear interpretation given the statute by the FCC, the agency most directly effected by the law and the agency possessing the institutional expertise relating to its proper interpretation, to which this Court must pay the deference normally due the opinions of expert agencies. *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

In its "Public Notice" dated January 24, 1979, the FCC stated in part as follows:

"... [T]he unauthorized reception and beneficial use of addressed communications in the Multipoint Distribution Service (MDS) is a violation of Section 605 of the Communications Act of 1934 (47 U.S.C. § 605).... MDS is a common carrier service which utilizes an omnidirectional radio transmission.... MDS stations are not television broadcasting stations.... Nor are MDS stations disseminating radio communications intended to be received by the general public.... Because material transmitted over stations is not intended to be 'broadcast' material within the meaning of Section 605, authority for its reception and use must be given by the sender. Therefore, persons will be in violation of the law if they divulge, publish, or use for their own benefit any MDS communications which they were not authorized to receive...."

In *Movie Systems, Inc. v. Heller*, 710 F.2d 492, 494 (8th Cir.1983), the court denied the claim by a defendant similarly situated to Adkins, observing that "courts have held that for the purposes of Section 605, the crucial factor in determining whether the programming is broadcasting for the use of the general public is not whether the content of the program has mass appeal or mass availability but rather, whether it was intended for the use of the general public." (citations omitted)

That court went on to hold, after observing that the only way access to the MDS programming can be received is through the use of specialized equipment, as follows:

"We hold that the MDS transmissions are not broadcasting for the use of the general public and thus Section 605 prohibits unauthorized interceptions of the MDS signal. *Movie Systems, Inc., supra*, at 495."

This decision as to the applicability of Section 605 to unauthorized receipt and use of the MDS signal is consistent with the

holdings in the overwhelming majority of similar cases. *See Chartwell Communications Group v. Westbrook, Ind.,* 637 F.2d 459 (6th Cir.1980); *KMLA Broadcasting Corporation v. Twentieth Century Cigarette Vendors Corporation,* 264 F.Supp. 35 (C.D.Calif.1967); *Home Box Office, Inc. v. Advanced Consumer Technology, Movie Antenna, Inc.,* 549 F.Supp. 14 (S.D.N.Y.1981). The case at bar offers no basis on which to distinguish as inapplicable the other holdings or to challenge the clear wording of the statute.

The more difficult legal question in this case relates to whether or not the unauthorized acquisition of the TVQ signal by Adkins constituted a violation of the "wiretap" statutes at 18 U.S.C. 2510 *et seq.* There is little by way of case law which is directly on point from which the Court can be assisted in interpreting these statutes. However, in analyzing the statutes themselves and in reviewing the legislative history, it is clear that Adkins' actions do not constitute a violation of the wiretap statutes.

The wiretap statutes, originally enacted as a part of the Omnibus Crime Control Act of 1970, were directed at proscribing those acts which threatened to violate the privacy interests of individuals in their personal conversations. In enacting this Statute, Congress found it necessary to provide a means to "safeguard the privacy of innocent persons and protect effectively the privacy of wire and oral communications" from illegal interception. 18 U.S.C.S. § 2510, (citing the Legislative History and Findings, at page 54).

Section 2510(1) and (4), Title 18, United States Code, set forth the operative definitions as follows:

"(1) 'wire communication' means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like *connection between the point of origin and the point of reception* furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications;

(4) 'intercept' means the aural acquisition of the contents of any *wire* or oral *communication* through the use of any electronic, mechanical or other device." (emphasis supplied)

The violation is set forth at Section 2511(1)(a), wherein it says, "[A]ny person who ... willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication ... shall be fined not more than $10,000 or imprisoned not more than five years, or both." (Civil penalties are provided for at § 2520.)

The communications with which Adkins interfered in the case at bar were not private conversations between individuals. Furthermore, at the time Adkins received the TVQ signal, it had been dispersed in an omnidirectional path throughout the Indianapolis metropolitan area and not connected up to any reception point prior to its receipt by Adkins. TVQ would make Adkins liable under the wiretap statutes by alleging that the signal it had produced was a "wire communication" as defined at 18 U.S.C. § 2510 and that Adkins had "intercepted" it, also as defined in that section. That assertion of liability by TVQ distorts both the definitions of "wire communication" and "intercept," as more fully enunciated in the preceding Conclusions of Law, and distorts the thrust of the statute generally, as evidenced from its legislative history. Accordingly, TVQ's claims on this ground fail.

Finally, it deserves mention that Mr. Adkins, who must have known that he was getting something for nothing when he devised his own method for receiving the HBO programming at his home without paying the required fee for that service, nonetheless might also have surmised, from the ease with which he could acquire the signal, that there was little actual value in what he took and that his taking it was not a serious matter (in a legal sense). The fact that the signal was readily available to Mr. Adkins, or anyone else similarly skilled

in devising his own means of acquiring the "free" programming, might lend itself to a conclusion that what was done was harmless, or, at least, that any law or judicial opinion to the contrary is unenforceable.

This view, however, is in error and obscures the real issues in this case by failing to take into account the distinction between a television service which is *available* to the general public and a program *intended for the use* of the general public. Obviously, TVQ's business hopes are based on its ability to sell its private programming service to as wide a sector of the consuming public as possible, that is to say, it hopes for as great a number of subscribers as possible. Thus it transmits its communications signal in a way designed to reach that market breadth, while at the same time maintaining essentially a private programming service. This is not the same situation which exists with a radio broadcast which is intended for use by the general public without payment of a fee, without specialized equipment and without the consent of the producer. Congress has, in its wisdom, provided for both types of programming service, with their respective advantages and disadvantages in both a business and regulatory sense. A failure to distinguish between the two systems overlooks their uniqueness and their respective value to the public. TVQ and other similar entities which transmit programming through an MDS format are entitled to protection under 47 U.S.C. § 605, irrespective of the possible enforcement problems which those protections imply.

The Sixth Circuit, in 1980, observed in *Chartwell Communications Group v. Westbrook, supra,* 462–3, that "subscription radio and television have been in existence for over 30 years, but their widespread availability to residential consumers is a relatively recent phenomenon. There has been very little litigation on the question of unauthorized reception of subscription television signals and the remedies, if any, available to the subscription television services."

Since 1980, the amount of law on the subject has increased but the public understanding of those statutes and their interpretations seems nonetheless to have lagged. This Court is faced, therefore, with a situation where its function is as much to explain the applicable law, as to decide the immediate controversy. In doing so, and primarily because of the problems which enforcement of the rights protected by Section 605 portends, it is hoped that this ruling will serve as an aid to understanding by those who otherwise would err through inadvertence or confusion and a deterrent to those who otherwise would allow themselves to be in violation of these statutes.