AMERICAN TELEVISION AND COM-
MUNICATIONS CORPORATION,
d/b/a Orange-Seminole Cablevision of
Central Florida; Home Box Office,
Inc.; Entertainment and Sports Pro-
gramming Network, Inc.; Southern
Satellite Systems, Inc., Plaintiffs,

v.

FLOKEN, LTD., a limited partnership
d/b/a Howard Johnson's Motor Lodge;
Center City Corporation of Orlando,
Gainesville P–H Properties, Inc., d/b/a
Days Inn Orlando and Days Inn Kis-
simmee; Parkmount Properties, Inc.,
N.V., d/b/a Rodeway Inn; Frontier Mo-
tel, Inc., d/b/a Best Western-Kissimmee
Frontier, a/k/a Ramada Inn East; etc.,
et al., Defendants.

No. 84–498–CIV–ORL–18.

United States District Court,
M.D. Florida,
Orlando Division.

Feb. 14, 1986.

Terry S. Bienstock and Philip J. Kantor, Frates, Bienstock & Sheehe, Miami, Fla., Anne E. Stern, American Television & Communications Corp., Englewood, Colo., and Frank Kruppenbacher, Swann & Haddock, P.A., Orlando, Fla., for plaintiffs.

Hal K. Litchford, Davis, Litchford, Downing & Christopher, Orlando, Fla., for Kon-Tiki.

Lawrence J. Pino, Orlando, Fla., for Gala.

Joseph E. Foster, Akerman, Senterfitt & Eidson, Orlando, Fla., for Floken, Ltd., Gainesville P–H Properties, Inc., Frontier Motel, Inc., Friendship Development Corp., Southern Motel Management Co., Inc. and Altamonte Lodges, Inc.

Denise G. Morris, Burton Bruggeman, III, Orlando, Fla., for Chopra, Gupta & Singh.

Marvin L. Beaman, Jr., Winter Park, Fla., for Center City Corp. Orlando and Claytons.

Michael J. Appleton, Winter Park, Fla., for Caravey Inns.

Ronald M. Hand, Kissimmee, Fla., Barry L. Miller, Orlando, Fla., for Gulf South Resources and Econo Lodge Main Gate East.

## ORDER

GEORGE KENDALL SHARP, District Judge.

This case is before the Court upon plaintiffs' motion for preliminary injunction. Plaintiffs have settled with defendants Parkmount Properties, Inc., d/b/a Roadway Inn, and Colonial Motor, Inc., d/b/a Colonial Motor Lodge, and the Court granted a motion for summary judgment by defendant Gold Key Investment Fund, Ltd., d/b/a Gold Key Inn. The remaining defendants in this action are: Floken, Ltd., d/b/a Howard Johnson's Motor Lodge (Floken); Center City Corporation of Orlando,

d/b/a Howard Johnson's Motor Lodge (Center City); Gainesville P–H Properties, Inc., d/b/a Days Inn Orlando and Days Inn Kissimmee (Gainesville P–H Properties); Frontier Motel, Inc., d/b/a Best Western–Kissimmee Frontier, a/k/a Ramada Inn East (Frontier); Kon-Tiki Investors, Ltd., d/b/a Kon-Tiki Village Resort Hotel (Kon-Tiki); Caravey Inns of Florida, Inc., d/b/a Caravey Inn (Caravey); Gala Amusements, Inc., d/b/a Gala Vista Motor Inn (Gala Vista); Gulf South Resources, Inc., d/b/a Econo Lodge Main Gate East (Gulf South Resources); C.W. Clayton and W.M. Clayton, d/b/a Diplomat Motor Inn (Diplomat); Friendship Development Corporation, d/b/a Tropicana Motel (Tropicana); Mohan S. Chopra, Rajinora P. Gupta, Mehemora P. Gupta, Pabitor Singh, and Daljeet Singh, d/b/a Travelodge Main Gate East (Travelodge); Southern Motel Management Company, Inc., d/b/a Southern Sun Inn (Southern Sun); and Altamonte Lodges, Inc., d/b/a Ramada Inn Central (Altamonte Lodges).

In this action, plaintiffs seek damages, preliminary and permanent injunctions, and further relief as necessary or proper for alleged violations of § 605 of the Federal Communications Act of 1934, 47 U.S.C.A. § 605, the Copyright Act of 1976, 17 U.S.C.A. §§ 101–810, the Lanham Act, 15 U.S.C.A. §§ 1051–1125, and Florida statutory and common law. Plaintiffs seek relief for defendants' unauthorized and willful interception, reception, exhibition, and public performance of copyrighted and otherwise protected audiovisual programming through the use of satellite reception dish antennas at their hotels and/or motels. Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following findings of fact and conclusions of law on plaintiffs' motion for preliminary injunction.

## FINDINGS OF FACT

Plaintiffs have filed a verified complaint and affidavits by a corporate vice-president and an investigator. This evidence is supplemented with discovery filed by several defendants. The Court has determined the facts based upon this information.

American Television and Communications Corporation (ATC), distributes subscription television, and owns and operates cable television systems in, *inter alia*, Orange and Osceola counties. ATC does business as Orange-Seminole Cablevision, Kissimmee Cablevision, and Cablevision of Central Florida. ATC contracts with basic programming services who supply programming, the copyrights of which are owned by basic service suppliers or their program originators. Through various contractual arrangements, ATC has acquired the rights to exhibit, perform, and retransmit such programming to its customers. ATC pays the originators of the programming for such exhibition and performance rights, and pays copyright fees to the Copyright Royalty Tribunal and licensing fees to the satellite programmers. ATC is authorized to receive programming services directly by satellite antennas, and to distribute such television programming to customers through its local cable distribution system. ATC retransmits the programming services which it has acquired to subscribers by a coaxial cable and related equipment which it owns and maintains. ATC has expended substantial sums for marketing, promoting, and servicing its cable television systems in Orange and Osceola Counties. The monthly charge paid by ATC's customers for the basic and premium programming is the primary source of revenue for ATC's cable systems and services.

ATC provides a basic cable service to subscribers for a monthly fee. The basic cable service includes local broadcast stations, television programming imported from other markets, and special programming services. ATC also offers premium programming, including Home Box Office (HBO) and Cinemax, to its subscribers at an additional charge. This premium programming consists primarily of feature films, sports events, and special entertainment events, the copyrights to which are owned by entertainment programming service companies such as HBO or their programming suppliers.

HBO produces private, commercial-free pay television entertainment services, known as "Home Box Office" and "Cinemax." Home Box Office and Cinemax feature movies, special events, and sports programming, some of which are copyrighted under the copyright laws of the United States. Entertainment and Sports Programming Network, Inc. (ESPN), produces private, television entertainment services which primarily feature amateur and professional sports events. ESPN programming is copyrighted under the copyright laws of the United States. HBO and ESPN acquire distribution and public display rights for their programming from authors, producers, event organizers, or distributors, and distribute such works in an entertainment programming service. HBO and ESPN program services are delivered in the United States by means of satellite transmissions or "feeds." HBO and ESPN contract with subscription television operators, such as ATC, to receive their satellite feeds and to distribute their programming services to the local operator's customers by means of cable television, master antenna, direct satellite reception, or microwave distribution service. The customers of these services receive the signal by means of satellite antenna dishes or "earth stations." Cable system operators pay a fee to HBO for each customer who subscribes to the Home Box Office and Cinemax services, and pay a subscription fee for the right to include ESPN in their cable, master antenna, and microwave transmissions. ESPN and its affiliated operators share commercial announcement time integrated into ESPN's network feeds. HBO has registered its trademark and trade name in order to identify and to distinguish its products from those of competitors.

Southern Satellite Systems, Inc. (SSS), is a resale communications common carrier licensed by the Federal Communications Commission (FCC) to lease channels of communication to others. SSS transmits via satellite the signal of WTBS, an independent television broadcast station in Atlanta, Georgia, which broadcasts sports, movies, variety programs, and news full time. The FCC has authorized SSS to establish and to operate one leased channel of communications via RCA Americom's SATCOM satellite to specified locations through the contiguous forty-eight states, Alaska, Hawaii, Puerto Rico, and the United States Virgin Islands for the point-to-point multipoint distribution (MDS) of television and associated audio signals of independent broadcast station WTBS to various customers. SSS retransmits the television signal of WTBS to local cable operators, including ATC, which have contracted for its carrier signal services and which pay fees for the right to receive the WTBS signal via satellite.

The entertainment programming services offered by HBO, ESPN, SSS and ATC, via its cable systems, provide their customers with services different from those provided by "free" standard broadcast television. The signals transmitted via satellite to ATC, other cable system operators, and other fee-paying distributors cannot be received in their transmitted form by conventional television sets and antennas. The satellite dish antennas or earth stations employed by defendants to intercept the signals are not receivers of the kind commonly used in private homes. However, the television programming transmitted by plaintiffs HBO, ESPN, and SSS and intended for ATC and other fee-paying distributors can be received by anyone with the proper equipment. Although plaintiffs vigorously promote their services and seek to maximize the number of fee-paying customers, the signals they transmit and receive are intended for use only by paying customers, and are not intended for the benefit of or use by the general public.

All of the defendants operate hotels or motels in Orange or Osceola counties, and have purchased and installed satellite antennas and retransmission equipment. Defendants have used this equipment to receive satellite signals intended for fee-paying customers of HBO, ESPN, SSS, and other subscription television services. Defendants retransmit the programs to patrons' rooms. Various defendants have advertised the availability of these subscrip-

tion television services in order to attract customers to their hotels/motels.

With the exception of Kon-Tiki, defendants' satellite reception and retransmissions were without the knowledge, consent, or license of plaintiffs. Defendant Kon-Tiki has produced affidavits and contracts which establish that it is authorized to receive WTBS, ESPN, CNN, The Movie Channel, and the USA Network. Therefore, ATC and SSS appear to concede their claims against Kon-Tiki. However, Kon-Tiki has admitted that on several occasions Home Box Office programs were available on the Kon-Tiki cable television system despite its lack of authorization to show these programs. The Kon-Tiki management is unable to explain this inadvertent display of Home Box Office on its cable system. However, on one occasion an employee manipulated the Kon-Tiki television system to receive the Home Box Office programming without the knowledge or authorization of the management. Hereinafter collective reference to defendants does not include Kon-Tiki. Gala Vista also has produced evidence establishing that it is authorized to receive the WTBS signal transmitted by SSS.

All plaintiffs have asserted some claim against each defendant, with the exception that HBO and SSS have not asserted any claims against Gainesville P–H Properties and Kon-Tiki, respectively. Most of the defendants have been notified by ATC that their activities are unauthorized and unlawful. Nevertheless, these defendants have persisted in their conduct.

The affidavit of plaintiffs' investigator, Robert L. Knight, and the discovery filed by defendants establish that the following programming services and the logo for those services have been displayed at the specified motels/hotels on at least one occasion:

Floken: Home Box Office, Cinemax, Cable News Network (CNN)

Center City: Home Box Office

Gainesville P–H Properties: ESPN, Cinemax, CNN, The Movie Channel, The Disney Channel, Hometeam Sportswire, and Nashville Network

Frontier: ESPN, Cinemax, CNN

Kon-Tiki: ESPN, Home Box Office, CNN, The Movie Channel

Caravey Inns: ESPN and Cinemax

Gala Vista: The Movie Channel

Gulf South Resources: Home Box Office, Cinemax, The Movie Channel, ESPN

Diplomat: Cinemax, Home Box Office

Tropicana: Cinemax, ESPN, The Movie Channel

Travelodge: Home Box Office, ESPN, Showtime

Southern Sun: The Movie Channel, Hometeam Sportswire, The Disney Channel

Altamonte Lodges: Cinemax, MTV

Knight observed that defendants Center City and Gulf South Resources advertised various programming services, and that satellite dishes were visible at each hotel/motel.

Defendants' unauthorized reception, use, and retransmission has deprived plaintiffs of the value of their business investment, business opportunities, reputation, and goodwill. In addition, plaintiffs have lost the value, benefits, and profits derived from cable retransmission to defendants and their patrons. Each time the defendants intercept, use, or retransmit plaintiffs' programming, plaintiffs irretrievably lose a customer for such retransmission and the revenues derived from retransmission.

ATC has attempted to sell its services to most of the defendants, and they have refused to purchase the services which they receive without payment. Defendants' conduct also has had an impact upon ATC's ability to market its programming services to other hotels/motels in the franchise area. HBO and ESPN have lost a portion of their investments, and they have suffered a concomitant reduction in revenue for the future acquisition, production, and distribution of audiovisual works. Additionally, SSS faces the loss of revenues for the transmission of the WTBS signal.

Plaintiffs are unable to detect or determine when individuals in defendants' establishments are receiving the programming

services without payment by the defendants, how long or often such services are received, or how long such unpaid interception will continue. Furthermore, each defendant is capable of receiving other services merely by repositioning their earth stations. Plaintiffs have no practical method of terminating or preventing the interception and retransmission of the programming by defendants.

## CONCLUSIONS OF LAW

■ The Court has jurisdiction over plaintiffs' Communications Act claim under 28 U.S.C. § 1331, and over the federal copyright, trademark and unfair competition claims under 28 U.S.C. § 1338. Federal jurisdiction over the state law claims is proper because these claims share a common nucleus of operative facts with the federal issues. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

In order to prevail on a motion for preliminary injunction, the moving party must establish the following four prerequisites:

1. A substantial likelihood that the moving party ultimately will prevail on the merits of the claim.

2. Irreparable injury unless the injunction is issued.

3. The threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing parties.

4. The injunction would not be adverse to the public interest.

*See, e.g., Callaway v. Block*, 763 F.2d 1283, 1287 (11th Cir.1985); *Cate v. Oldham*, 707 F.2d 1176, 1185 (11th Cir.1983); *Productos Carnic, S.A. v. Central American Beef and Seafood Trading Co.*, 621 F.2d 683 (5th Cir.1980).

### A. *Likelihood of Success on the Merits*

1. Violation of 47 U.S.C.A. § 605

In assessing plaintiffs' likelihood of success on the merits, the Court first evaluates the § 605 claim. Section 605 was amended substantially by the Comprehensive Cable Telecommunications Act of 1984, P.L. No. 98–549, 98 Stat. 2802 (Cable Act of 1984), which became effective December 30, 1984. Plaintiffs' § 605 claims will be analyzed under both the version of § 605 in effect at the time of suit (the former § 605) and the present version of the section (the amended § 605). Although the Cable Act of 1984 redesignates § 605 of the Federal Communications Act of 1934 as § 705, the amendments are codified at 47 U.S.C.A. § 605.

Numerous courts have determined that a private right of action may be implied under the former § 605 for aggrieved parties suffering injuries arising out of a violation of that section. *See, e.g., National Subscription Television v. S & H TV*, 644 F.2d 820, 821 n. 1 (9th Cir.1981); *Chartwell Communications Group v. Westbrook*, 637 F.2d 459, 466 (6th Cir.1980); *Hoosier Home Theater, Inc. v. Adkins*, 595 F.Supp. 389, 395 (S.D.Ind.1984); *Ciminelli v. Cablevision*, 583 F.Supp. 158, 160–61 (E.D.N.Y.1984); *Cox Cable Cleveland Area, Inc. v. King*, 582 F.Supp. 376, 380 (N.D.Ohio 1983). At the time this action was filed, section 605 provided in pertinent part:

No person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception ... No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was

intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto: This section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication which is transmitted by any station for the use of the general public, which relates to ships, aircraft, vehicles or persons in distress, or which is transmitted by an amateur radio station operator or by a citizens band radio operator.

47 U.S.C. § 605 (1982). The protection afforded to "radio communications" under the former § 605 has been extended to television communications, *Chartwell*, 637 F.2d at 462, including television signal transmissions via satellite. *See, e.g., California Satellite Systems v. Seimon*, 767 F.2d 1364 (9th Cir.1985); *National Football League v. The Alley, Inc.*, 624 F.Supp. 6 (Order Containing Findings of Fact and Conclusions of Law, 1983); *American Television and Communications Corporation v. The Alley, Inc.*, Case No. 81–969–CIV–EBD (Order Aug. 24, 1981); *see also In the Matter of Regulation of Domestic Receive-Only Satellite Earth Stations*, 74 F.C.C.2d 205, 216 (1979).

■ Furthermore, despite early case law to the contrary, it is clear under current authority that plaintiffs' transmissions and retransmissions do not fall within the former § 605 proviso excepting broadcasts for the use of the general public from the protection afforded by that section. *See, e.g., S & H TV*, 644 F.2d at 824; *National Football League v. Bruno's*, 621 F.Supp. 880 (E.D.Mo.1985); *Hoosier Home Theater*, 595 F.Supp. at 395; *American Television & Communications Corporation v. Western Techtronics*, 529 F.Supp. 617, 620 (D.Colo.1982). *Contra Orth-O-Vision, Inc. v. Home Box Office*, 474 F.Supp. 672, 681–82 (S.D.N.Y.1979). "[T]he crucial factor in determining whether the programming is broadcasting for the use of the general public is not whether the content of the program has mass appeal or mass availability but rather, whether it was *intended* for the use of the general public." *Movie Systems, Inc. v. Heller*, 710 F.2d 492, 494 (9th Cir.1983) (emphasis in original). As the Sixth Circuit indicated:

We think there is an important distinction between making a service available to the general public and intending a program for the use of the general public. The whole point of STV [subscription television] is to provide the service to as many members of the public as are interested. If the services could not be widely distributed there would be no business. However, the dual nature of STV is that while it may be available to the general public, it is intended for the exclusive use of paying subscribers. Available and use are separate concepts.

*Chartwell*, 637 F.2d at 465. By definition, subscription television is intended only for those who purchase it. Furthermore, special equipment is required to intercept the signals. Thus, the Court concludes that the programming services transmitted by plaintiffs ESPN, HBO, and SSS are intended only for fee-paying customers such as ATC. In turn, the ATC cable retransmissions are intended solely for its subscribers.

Having determined that plaintiffs' services are entitled to the protection of the former § 605, the next issue is whether or not defendants have violated the former § 605. On this issue, the record is clear. With the exception of Kon-Tiki, defendants have deliberately intercepted transmissions without authorization, and have divulged or published the intercepted programs without authorization for their own benefit and the benefit of their guests. This conduct violates the express language of the former § 605.

In the Cable Act of 1984, Congress amended the Federal Communications Act of 1934 in an attempt to deal with the problems caused by the newly developed satellite cable technology. The new Cable Act of 1984 preserves the former § 605 virtually intact as subsection (a), and ex-

plicitly provides for a private right of action in subsection (d). Preliminary injunctive relief such as defendants seek is available in addition to damages. The amended section confirms the case law under the prior section. H.R.Rep. No. 934, 98th Cong., 2d Sess., *reprinted in* 1984 U.S. Code Cong. & Ad.News 4655, 4746. However, Congress created an exception from the prohibition of amended § 605(a) under specified circumstances for "the interception or receipt by any individual, or the assisting (including the manufacture or sale) of such interception or receipt, of any satellite cable programming for private viewing." 47 U.S.C.A. § 605(b).

■ This exception, however, is little solace to defendants. Subsection (c)(4) of amended § 605 defines private viewing as "the viewing for private use in an individual's dwelling unit by means of equipment, owned or operated by such individual, capable of receiving satellite cable programming directly from a satellite." The "private viewing" exception was created to protect individual owners of backyard earth stations and their suppliers. Defendants' use of satellite dishes to provide satellite cable programming for their hotel/motel guests without payment of subscription fees, and for their own commercial advantage does not fall within the "private viewing" exception. This conclusion is mandated not only by the language of the statute, but also by the legislative history. According to the legislative history, the drafters of the bill neither contemplated nor intended that the "private viewing" exception include private cable systems or "display of satellite cable programming in the public area of an apartment building, condominium, or housing complex, or in taverns, restaurants, or fraternal halls." 1984 U.S. Code Cong. & Ad.News at 4749–50. Thus, defendants conduct remains illegal under the newly enacted legislation.

### 2. ATC's Standing

Although the Court concludes that defendants' conduct violated both the former and amended versions of § 605, the Court also must determine whether or not ATC has standing under § 605 before conclud-

ing that plaintiffs have shown a substantial likelihood of success on their § 605 claims. A number of the defendants have argued that ATC lacks standing to challenge defendants' violations of the former § 605. Defendants emphasized that the cases relied upon by ATC were brought by plaintiffs who were broadcasters, originators, or transmitters of programs or signals. For example, a number of cases have held defendants liable for manufacturing, distributing, selling, or using decoding or converting equipment to intercept subscription television programming. *See, e.g., ON/TV of Chicago v. Julien,* 763 F.2d 839 (7th Cir.1985); *S & H TV,* 644 F.2d at 821; *Chartwell,* 637 F.2d at 460–61; *Cox Cable,* 582 F.Supp. at 378. Similarly, courts have found violations of the former and the amended § 605 for manufacturing, distributing, selling, or using electronic decoding equipment such as microwave antennae and down-converters to intercept subscription television signals transmitted via MDS. *See, e.g., California Satellite Systems,* 767 F.2d at 1365; *Heller,* 710 F.2d at 493; *Hoosier Home Theater,* 595 F.Supp. at 392–93; *Western Techtronics,* 529 F.Supp. at 618–19.

In this case, defendants have not intercepted or received any satellite signal or cable transmission by ATC. Instead, defendants have intercepted satellite signals transmitted by program originators or transmitters, such as HBO, ESPN, and SSS, which were intended for authorized distributors, such as ATC. ATC has contracted for the right to receive these signals, and, unlike defendants, has paid for that right and the concomitant right to retransmit programming to subscribers in the Orange-Osceola county distribution area.

Only two cases have involved parties in a factual posture comparable to that of ATC in this case. In *Entertainment and Sports Programming Network, Inc. v. Edinburg Community Hotel, Inc.,* 623 F.Supp. 647 (Final Judgment for Permanent Injunction and Damages, 1985), a district court held that a local cable television distributor had standing under both ver-

sions of § 605 to sue a motel which used a satellite dish to intercept signals intended for the cable company. *Id.* at 651. However, the parties in that case stipulated to the operative facts and agreed to entry of the order and judgment. Thus, the *Edinburg* case is of limited persuasive weight. On the other hand, the court in *Air Capital Cablevision, Inc. v. Starlink Communications Group, Inc.,* 601 F.Supp. 1568, 1570–72 (D.Kansas 1985), adhered to a literal interpretation of the language in the former § 605. The *Starlink* court determined that the plaintiff cable company had only a collateral right to receive the satellite signals, and concluded: "The cable company simply has no standing to claim violations under former § 605 of the Communications Act because the users of the earth station were not intercepting a transmission originated by or retransmitted by the cable company." *Id.* at 1572; *see also Bruno's,* 621 F.Supp. at 890 (*dictum*).

 Although ATC's role as intended, authorized, recipient of the intercepted signals admittedly does not fall within the literal language of either the former or the amended § 605, the Court concludes that ATC has standing to seek redress for violations of § 605. In order to establish standing, a party must allege an injury to itself which "is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Watts v. Boyd Properties, Inc.,* 758 F.2d 1482, 1484 (11th Cir.1985). The standing inquiry "involves both constitutional limitations on federal court jurisdiction and prudential limitations." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

 The constitutional standing requirement is derived from the Art. III, which limits the jurisdiction of federal courts to "cases or controversies." *See, e.g., Lynch v. Baxley,* 744 F.2d 1452, 1455 (11th Cir.1984). In order to meet the constitutional standing requirement, a party must allege "a personal stake in the outcome of the controversy." *Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972) (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)); *RITE-Research Improves the Environment, Inc. v. Costle,* 650 F.2d 1312, 1319 (5th Cir.1981). A plaintiff may show a personal stake in a controversy by showing injury. *Lynch v. Baxley,* 744 F.2d at 1456. "Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607–08, 60 L.Ed.2d 66 (1979) (citations omitted)); *Bank Stationers Ass'n v. Board of Governors of the Federal Reserve System,* 704 F.2d 1233, 1235 (11th Cir.1983). This "injury in fact" may be "economic or otherwise." *Valley Forge,* 454 U.S. at 486, 102 S.Ct. at 766; *Ass'n of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The injury or threatened injury must be "real and immediate," not "conjectural" or "hypothetical." *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); *Lynch v. Baxley,* 744 F.2d at 1456.

 In addition to showing "injury in fact," Art. III also requires that a party fulfill a causation requirement in order to establish standing. *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758–59; *Harrington v. Bush,* 553 F.2d 190, 205 n. 68 (D.C.Cir. 1977). Thus, plaintiff must show "injury in fact" resulting from or fairly traceable to defendants' putatively illegal action. *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758–59; *Eastern Kentucky Welfare Rights Organization,* 426 U.S. at 41–42, 96 S.Ct. at 1925–26; *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148–49, 35 L.Ed.2d 536 (1973); *Harrington,* 553 F.2d at 205 n. 68. Finally, a party must show "an injury that is likely to be redressed by a favorable decision." *Eastern Kentucky Welfare Rights,* 426 U.S. at 38, 96 S.Ct. at 1924; *Valley Forge,* 454 U.S. at 472, 102

S.Ct. at 758–59; *Boyd Properties,* 758 F.2d at 1484–85; *Harrington,* 553 F.2d at 205 n. 68. These requirements assure that legal controversies are decided in "a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758.

Beyond these constitutional requirements, the federal courts have developed prudential limitations on a party's standing to sue. In *Warth,* the Supreme Court discussed the most important prudential limitation on standing:

> [T]he source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing that, apart from Art. III's minimum requirement, serve to limit the role of the courts in resolving public disputes. Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.

*Warth,* 422 U.S. at 500, 95 S.Ct. at 2206 (footnote omitted). The courts have adopted a "zone of interests" test to determine if a statute or constitutional provision grants a particular party a right to judicial relief. In order to satisfy this test, a party's claim must be "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Data Processing,* 397 U.S. at 153, 90 S.Ct. at 829–30. The Supreme Court expressly reaffirmed the zone of interests test in *Valley Forge.* 454 U.S. at 474, 102 S.Ct. at 759–60; *see Bank Stationers,* 704 F.2d at 1235.

ATC has satisfied all four criteria necessary to establish standing under § 605. Section 605 prohibits unauthorized reception and retransmission of satellite signals by unintended and unauthorized receivers. ATC clearly has a personal stake in the outcome of this controversy and has suffered "injury in fact." Defendants' unauthorized reception, use, and retransmission has deprived and will continue to deprive ATC of customers. Such a reduction in demand for a product is sufficient to establish injury in fact. *See, e.g., Data Processing,* 397 U.S. at 152, 90 S.Ct. at 829; *Bank Stationers,* 704 F.2d at 1235; *National Football League v. Cousin Hugo's, Inc.,* Copy L.Rep. (CCH) ¶ 25,788 (E.D.Mo.1984). Furthermore, ATC has contracted and paid for the right to distribute numerous programming services in the Orange-Osceola County area. This is a significant proprietary interest, *see Western Techtronics,* 529 F.Supp. at 621, which has been damaged by defendants' pirating of signals. Thus, the Court concludes that ATC has demonstrated concrete injury fairly traceable to defendants' unauthorized reception and retransmission. Therefore, ATC has satisfied the "injury in fact" and causation requirements for standing.

ATC also must show that it's claims are arguably within the zone of interests intended to be protected by the former § 605. That section protects communications from unauthorized reception, use, and retransmission. Like the program originators in *National Football League v. The Alley, Inc.,* 624 F.Supp. 6 (S.D.Fla.1983), ATC has shown significant "economic and professional interests in the integrity of the communications systems." In this action, ATC seeks to further the statutory purpose of prohibiting unauthorized reception, use, and retransmission of protected communications.

Furthermore, as an authorized local distributor, ATC has greater ability and incentive to enforce the prohibitions of the former § 605 than do many of the programming services. The harm to programming services, such as ESPN and HBO, is in part derivative, since they usually receive fees from subscribers through local distributors, such as ATC. Thus, the greatest immediate impact from unauthorized reception is on local distributors, such as ATC. Moreover, denial of standing to local distributors would require each programming service to sue signal pirates in every locality, causing a multiplicity of parties and suits. The substantial harm to local distributors and the proliferation of lawsuits are significant policy justifications for affording local distributors, such as ATC,

standing under the former § 605. In summary, both the purpose and policies underlying the former § 605 support this Court's view that ATC has standing under that section to seek redress for defendants' conduct.

The final standing inquiry is whether the party's injury is likely to be redressed by a favorable decision. If defendants were prohibited from authorized reception, use, and retransmission of satellite signals, they would be required to pay fees to broadcasters, originators, transmitters or authorized distributors in order to legally receive the programming services which they now receive illegally. This remedy would redress ATC's injury, and would further the statutory purposes of the former § 605. Thus, after analysis of the four requisite factors, the Court concludes that ATC has standing under the former § 605.

ATC not only has standing under the former § 605, but also under the amended § 605. The newly amended § 605 provides for a civil action for damages and injunctive relief for "any person aggrieved" by a violation of that section. The legislative history states:

> Under subsection (3)(A) [of § 605], the term "any person aggrieved" shall be broadly interpreted by the courts in such cases and shall include those with any rights in the intercepted radio communications. Such persons would include but are not limited to, owners of the programming being transmitted as well as senders of the signal embodying the programming transmitted. Thus, the Committee amendment provides an explicit right of action for any person aggrieved by the violations of Section 705(a).

1984 U.S.Code Cong. & Ad.News at 4750. ATC has significant contractual rights in the intercepted satellite signals. Thus, ATC has standing under the broad interpretation contemplated by the framers of the amended § 605.

In summary, the Court concludes that the satellite transmissions are entitled to the protection of both versions of § 605, and that defendants' unauthorized reception, use, and retransmission of satellite signals violates that section. Further, ATC has standing to seek redress for defendants' illegal actions. Plaintiffs have established that they have a substantial likelihood of success of their claim under the former and the amended § 605. Thus, the Court need not address the merits of remaining claims at this preliminary stage in the proceedings.

### B. *Irreparable Injury*

■ In order to obtain preliminary injunctive relief, plaintiffs also must show that they will suffer irreparable injury if injunctive relief is not awarded. Plaintiffs are unable to determine when defendants are illegally receiving programming services, and defendants can alter the programming they are intercepting simply by repositioning their satellite dishes. Furthermore, plaintiffs irretrievably lose fee-paying customers because of defendants' illegal reception, use, and retransmission of satellite signals. *See, e.g., Chartwell,* 637 F.2d at 465–66.

Preliminary injunctive relief has been awarded in factual situations analogous to this case. *See, e.g., ON/TV of Chicago v. Julien,* 763 F.2d at 840; *Chartwell,* 637 F.2d 467; *Western Techtronics,* 529 F.Supp. at 621. Although the evidence establishing irreparable harm is "less than overwhelming, ... [i]n the area of section 605 violations a certain laxness has been recognized in evaluating the movant's proof of irreparable harm." *American Television and Communications Corporation v. Pirate T.V. Inc.,* Case No. 81–969–CIV–EBD (Order August 24, 1981). As the court in *Home Box Office, Inc. v. Pay T.V. of Greater New York,* 467 F.Supp. 525, 530 (E.D.N.Y.1979), stated:

> While the amount plaintiff is losing in fees can probably be estimated and awarded as damages, the injury to plaintiff's reputation and the interference with its business are not so readily repaired. Plaintiff plausibly claims that its present lack of control over the locations and customers being served by defend-

ant and defendant's representation of the pirated service as its own are damaging plaintiff's name and jeopardizing its expansion plans. A judgment for damages is hardly adequate to compensate for these.

Moreover, the amended § 605 explicitly provides for preliminary injunctive relief. 47 U.S.C.A. § 605(d). Therefore, the Court concludes that plaintiffs have made a sufficient showing of irreparable injury.

## C. *Balance of Equities*

The record shows that defendants' unauthorized reception, use, and retransmission of programming services substantially injures each of the plaintiffs by allowing defendants to obtain subscription programming without payment and by eliminating plaintiffs' potential paying customers. On the other hand, the harm to the defendants from a preliminary injunction is relatively slight. Defendants have no intrinsic right to violate the federal communications laws. Moreover, defendants may continue to obtain subscription programming by paying for it. In the unlikely event that defendants prevail on the merits, the court may order plaintiffs to refund the fees paid by defendants. Thus, plaintiffs have shown that the harm to them outweighs whatever damage a preliminary injunction may cause defendants. *See, e.g., Cox Cable,* 582 F.Supp. at 381; *Western Techtronics,* 529 F.Supp. at 621.

## D. *Public Interest*

A preliminary injunction also will serve the public interest. Congress and the courts have recognized and protected plaintiffs' interests in private communications, including satellite communications. A preliminary injunction safeguards the integrity of the communications system. Defendants' conduct is illegal and hinders the intended operation of that system. Furthermore, members of the public who choose to subscribe to plaintiffs' services have an interest in assuring a broad, equitable subscriber base and in insuring that they are not forced to bear a disproportionate share of the costs of the national and local satel-lite programming systems. *See Cox Cable,* 582 F.Supp. at 381.

## CONCLUSION

In summary, the Court concludes that plaintiffs have established a substantial likelihood of success on the merits of their § 605 claim, irreparable injury from defendants' conduct, and that the balance of equities and public interest weigh in their favor. In view of plaintiffs' verified pleadings, the ability of defendants to change the target of their satellite piracy by simply repositioning their earth stations, the prohibitions of § 605, and defendants' past similar violations of § 605, defendants are preliminarily enjoined from any *unauthorized* reception, use, or retransmission of plaintiffs' programming. Defendants were given ample opportunity to specifically address the scope of the injunction, but failed to respond.

Accordingly, it is ORDERED that the defendants Floken, Ltd., d/b/a Howard Johnson's Motor Lodge; Center City Corporation of Orlando, d/b/a Howard Johnson's Motor Lodge; Gainesville P–H Properties, Inc., d/b/a Days Inn Orlando and Days Inn Kissimmee; Frontier Motel, Inc., d/b/a Best Western-Kissimmee Frontier, a/k/a Ramada Inn East; Caravey Inns of Florida, Inc., d/b/a Caravey Inn; Gala Amusements, Inc., d/b/a Gala Vista Motor Inn; Gulf South Resources, Inc., d/b/a Econo Lodge Main Gate East; C.W. Clayton and W.M. Clayton, d/b/a Diplomat Motor Inn; Friendship Development Corporation, d/b/a Tropicana Motel; Mohan S. Chopra, Rajinora P. Gupta, Mehemora P. Gupta, Pabitor Singh, and Daljeet Singh, d/b/a Travelodge Main Gate East; Southern Motel Management Company, Inc., d/b/a Southern Sun Inn; and Altamonte Lodges, Inc., d/b/a Ramada Inn Central are preliminarily enjoined from continued use of their earth stations for the purpose of intercepting, receiving, using, retransmitting, or exhibiting any satellite transmission of programming originated, transmitted, or distributed by plaintiffs without authorization from plaintiffs. HBO has

not asserted a claim against Gainesville P–H Properties; therefore, Gainesville P–H Properties is not enjoined from intercepting HBO signals. Furthermore, Gala Vista has shown that it is authorized to receive the WTBS signal; therefore, Gala Vista is not enjoined from intercepting SSS transmissions.

These defendants are further enjoined from destroying, transferring, or concealing any records, guest lists, sales receipts, documents, memoranda, program directories, invoices, purchase orders, bank records, books or ledgers, diagrams, advertisements, or equipment used in or pertaining to the purchase, lease design, construction, repair, installation, operation, or use of any equipment designed, adapted, used, capable of or intended for use in either intercepting, receiving, appropriating or retransmitting satellite transmissions of programming owned or used by plaintiffs, during the pendency of this action.

IT IS FURTHER ORDERED that plaintiffs shall each post bond in the amount of $10,000.00 for the protection of the enjoined defendants should they be found to have been wrongly enjoined.