QUINCY CABLESYSTEMS, INC., and
New England Sports Network,
Plaintiffs,

v.

SULLY'S BAR, INC., d/b/a Sully's Bar,
Darcy's Village Pub, Inc., d/b/a Dar-
cy's Village Pub, and C.M. Kane Corp.,
d/b/a Kane's Place, Defendants.

Civ. A. No. 86–2183–C.

United States District Court,
D. Massachusetts.

Dec. 31, 1986.

Philip X. Murray, Maurice T. Cunningham, Dwyer & Murray, Boston, Mass., for plaintiffs.

Carol S. Ball, Frank W. Kilburn & Associates, Boston, Mass., for Cafe Viking, Inc.

Arnold S. Solod, Solod and Rovner, P.A., Boston, Mass., for C.M. Kane Corp.

Nancy Gertner, Gail S. Strassfeld, Silverglate, Gertner, Baker, Fine, Good & Mizner, Boston, Mass., for Sully's Bar & Darcy's Pub.

## MEMORANDUM

CAFFREY, Senior District Judge.

This is a civil action in which plaintiffs New England Sports Network ("NESN") and Quincy Cablesystems, Inc. ("Quincy") seek injunctive and compensatory relief from defendants. The defendants in the case are three taverns located in Quincy, Massachusetts: Sully's Bar, Inc., d/b/a Sully's Bar ("Sully's"), Darcy's Village Pub, Inc., d/b/a Darcy's Village Pub ("Darcy's") and C.M. Kane Corp., d/b/a Kane's Place ("Kane's Place"). The matter is now before the Court on joint motions of defendants to dismiss.

Plaintiffs' complaint raises seven causes of action against defendants. Defendants move to dismiss the following counts for failure to state a claim upon which relief can be granted: Count One (Federal Communications Act, 47 U.S.C. § 605,[1] as to

---

1. Plaintiffs mistakenly refer to section 705 of the Federal Communications Act as 47 U.S.C.

plaintiff Quincy; Count Two (Lanham Act) as to plaintiff NESN; and Count Five (Tortious Interference with Contract); Count Six (Interference with Advantageous Business Relationships); and Count Seven (Conversion) as to both plaintiffs Quincy and NESN. In addition, defendants move to dismiss Count Three (Copyright) for lack of subject matter jurisdiction.

Plaintiff Quincy owns and operates the cable television system in Quincy, Massachusetts. Plaintiff NESN is a program provider which has acquired contractual rights to broadcast various sports programs, including Boston Red Sox and Boston Bruins games. Quincy has contracted with NESN to receive NESN's programs for transmittal to Quincy's cable customers for a fee. NESN transmits programs to Quincy via satellite signals. Both plaintiffs intend that their programming reach only members of the general public who pay a fee for receiving those programs.

Each of the defendant taverns owns and operates a satellite dish antenna. Using these satellite dishes, the defendants have been intercepting NESN signals intended for direct receipt only by Quincy and exhibiting NESN programs to their customers without the permission of, or payment of fees to, either of the plaintiffs. The plaintiffs allege that the defendants thereby are violating both federal and state law.

## I. *Federal Communications Act*

In Count One of their complaint, plaintiffs NESN and Quincy allege that defendants have violated the Federal Communications Act, 47 U.S.C. § 605(a), by intercepting and receiving communications to which they are not entitled. Section 605(a) provides in pertinent part:

No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, ef-

fect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication ... for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents ... of such communication ... knowing that such communication was intercepted, shall divulge or publish the existence, contents ... of such communication ... or use such communication ... for his own benefit or for the benefit of another not entitled thereto.

Prior to 1984, several courts ruled that there was an implied private right of action under § 605. *E.g., Chartwell Communications Group v. Westbrook,* 637 F.2d 459, 466 (6th Cir.1980). The 1984 Cable Act amended substantially the Federal Communications Act. The new Act explicitly provides for a private right of action in section 605, subsection (d). The pertinent part of this subsection, § 605(d)(3)(A), states that

[a]ny person aggrieved by any violation of subsection (a) of this section may bring a civil action in a United States district court or in any other court of competent jurisdiction.

Defendants move that the Federal Communications Act claim be dismissed as to plaintiff Quincy on the grounds that Quincy is not an "aggrieved person" within the meaning of § 605(d)(3)(A) and thus lacks standing to sue for alleged violations of § 605(a). Defendants argue that persons entitled to sue for violations of § 605(a) must be the senders or originators of the intercepted communications. The defendants emphasize that they did not intercept any transmission sent by plaintiff Quincy.

Authority is divided on the question of whether a party in Quincy's position has standing to sue under § 605(d) for alleged violations of § 605(a). Defendants princi-

---

§ 705. The Comprehensive Cable Communications Policy Act of 1984, P.L. No. 98–549 ("1984 Cable Act") amended substantially former § 605 of the Federal Communications Act, former 47 U.S.C. § 605. Although the 1984 Cable Act re-

designates § 605 of the Federal Communications Act as § 705, the amendments are codified at 47 U.S.C. § 605. This Court will, therefore, refer to the codified section number, 605.

pally rely on *Air Capital Cablevision, Inc. v. Starlink Communications Group, Inc.*, 601 F.Supp. 1568 (D. Kansas 1985), and the legislative history of § 605(d) contained therein. Plaintiffs, on the other hand, argue that Quincy is an "aggrieved person" within the meaning of § 605(d), and principally rely on *American Television and Communications Corporation v. Floken, Ltd.*, 629 F.Supp. 1462 (M.D.Fla.1986) and the legislative history of § 605(d) contained therein.

In *Starlink, supra,* two cablevision companies sued a distributor of satellite dish antannae, claiming violations of 47 U.S.C. § 605(a). The defendant's satellite dish antannae were used to receive satellite signals, but not the plaintiff's transmissions. In *Starlink,* as in this case, the plaintiff cable company received the satellite transmissions and then rebroadcast them to paying subscribers. The court in *Starlink* held that the plaintiff lacked standing under § 605(d). *Starlink,* 601 F.Supp. at 1571. The court explained that,

> [t]he cable company may have an exclusive right to retransmit ... the specialty programming to multiple users for profit, but the cable company can have only a collateral right to receive television signals directly from the satellite. The cable company simply has no standing to claim violations ... because the users of the earth station satellite dishes were not intercepting a transmission orginated by or retransmitted by the cable company.

*Id.* at 1572.

The main basis for the court's ruling in *Starlink* was the congressional intent of the new Act. The court quoted the remarks of Senator Goldwater during floor discussion of the 1984 Cable Act. Senator Goldwater stated that an "aggrieved party" who may bring a suit under this statute

> does not include those entities which possess limited rights of reception and retransmission to the programming, *such as cable systems* and other purchasers of the right to receive it after satellite transmission.

*Starlink,* 601 F.Supp. at 1572 (quoting 98 Cong.Rec. S 14284 (daily ed. October 11, 1984) (comments of Sen. Goldwater)).

The court in *Starlink* also relied on its discernment of the congressional intent in the 1984 Cable Act which exempted, in 47 U.S.C. § 605(b), the manufacture, distribution, and sale of earth station satellite dish antannae from the proscription of the Act, unless programming is encrypted or there is an established marketing system. *See Starlink,* 601 F.Supp. at 1569–1570. The court in *Starlink* reviewed the legislative history of this exemption, and concluded that "It is crystal clear to this Court that the 1984 amendments to the Communications Act of 1934 were enacted specifically to protect enterprises such as that in which Starlink Communications Group is engaged." *Id.* at 1570.

The court reconsidered its ruling on the standing issue in the *Starlink* case in an unpublished memorandum. *Air Capital Cablevision, Inc. v. Starlink Communications Group, Inc.,* No. 83–1997–K (D.Kan. May 23, 1985). The court, noting that it had "given great thought" to the standing issue, *id.* at 3, reaffirmed its ruling that a cable company which does not have its own transmission intercepted lacks standing under § 605. *Id.* The court explained that § 605 should not be interpreted to "prohibit the manufacture, distribution, sale, or use of earth station satellite dish antannae to receive programming transmitted via satellites." *Id.* at 5.

The reading of the 1984 amendments by the court in its original decision in *Starlink, supra,* and upon reconsideration, Memorandum, *supra,* is slightly askew, because the court read the explicit exemption of § 605(b) as a broader general policy that carried over into the definition of "any person aggrieved" in § 605(d). The great weight given by the court in *Starlink* to the protectionist policy in the § 605(b) exemption was noted in *National Football League v. McBee & Bruno's,* 621 F.Supp. 880 (E.D.Missouri, 1985). In *McBee & Bruno's* the court, summarizing the rationale of the *Starlink* decision, stated that

The main basis for the court's ruling was the Congressional intent set out in the new act, § 705(b) [§ 605(b)], effective December 30, 1984. The new Act provides that prohibited practices of communication interception shall not apply "to the interception or receipt by any individual ... of any satellite programming for private viewing" if the programming involved is not encrypted and a marketing program is not established. *Id.* § 705(b) [§ 605(b)].

*Id.* at 890. Section 605(b), however, is a specific exception to the general prohibition of § 605(a). As this Court ruled in granting a temporary restraining order in this case, *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.,* 640 F.Supp. 1159, 1161 (D.Mass. 1986),

> [The § 605(b)] exception applies only to the interception of unscrambled satellite cable programming by individuals for viewing in their private homes. The plain language of the exception in Section 705(b) [§ 605(b)] shows that it was not intended to, and does not, apply to commercial establishments which seek to enhance the appeal of their establishments by showing to their customers video programs whose signals are being transmitted via satellite to cable companies.

Thus, the policy of protection of satellite dish technology is well-defined and well-confined in § 605(b). The court in *Starlink* incorrectly read that protectionist policy as spilling over into the definition of "person aggrieved" in § 605(d).

The emphasis in *Starlink* on protection of the satellite dish antannae industry was an improper basis for deciding the issue of standing for the additional reason that the court in *Starlink* ignored the standard standing analysis. Standing requirements are drawn from two sources: constitutional and prudential. *Ozonoff v. Berzak,* 744 F.2d 224, 227 (1st Cir.1984). "The principles of standing determine whether a particular plaintiff is the type of person whom the law intends to protect against the type of harm of which he complains." *Id.* The

constitutional requirements come from the Article III "case or controversy" requirement; the prudential requirements are a matter of judicial self-restraint. In order to establish standing for purpose of the constitutional "case or controversy" requirement, a plaintiff "must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant; ... and that the injury 'is likely to be redressed by a favorable decision.'" *Heckler v. Mathews,* 465 U.S. 728, 738, 104 S.Ct. 1387, 1394, 79 L.Ed.2d 646 (1984). *See also Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 74, 98 S.Ct. 2620, 2631, 57 L.Ed.2d 595 (1978). The First Circuit explained the constitutional standing requirements as set forth in *Duke Power* as imposing "three fairly strict requirements, namely (1) an injury; (2) a causal connection between the injury and the complained-of acts; and (3) redressability." *Ozonoff,* 744 F.2d at 227.

Beyond the constitutional requirement, there are prudential limitations on a party's standing to sue. The plaintiff must show that his injury is of a sort which the law seeks to protect him. *Id.* (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982)). The plaintiff may do so by showing that the harm complained of amounts to a "common law" injury, or he may show that his claim falls "within the 'zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Ozonoff,* 744 F.2d at 227 (quoting *Valley Forge Christian College,* 454 U.S. at 475, 102 S.Ct. at 760). The nature of the prudential limitations is further clarified by the Supreme Court's discussion in *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The court stated that the question of prudential standing is essentially "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position

a right to judicial relief." *Id.* at 500, 95 S.Ct. at 2206.

■ Congress can expand standing by doing away with the prudential criteria, but the Article III limitations remain. *See, e.g., Bread Political Action Committee v. Federal Election Commission,* 455 U.S. 577, 584, 102 S.Ct. 1235, 1239, 71 L.Ed.2d 432 (1982); cases cited in Wright, *Federal Practice and Procedure: Jurisdiction 2d* § 3531.13 n. 1. As the First Circuit has explained, the "prudential requirements are typically excused only in unusual circumstances, such as where Congress has enacted a special 'person aggrieved' statute, allowing a plaintiff to act as a 'private attorney general....'" *Ozonoff,* 744 F.2d at 228. Thus, even where Congress has acted to expand standing, the Article III standing requirements must be satisfied. *See, e.g., Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972) (The phrase allowing a suit to be brought by any "person aggrieved" shows a congressional intention to define standing [under § 810(a) of the Civil Rights Act of 1968] as broadly as permitted by Article III of the Constitution). The Supreme Court has also recognized the power of Congress to create new interests, the invasion of which will confer standing; when Congress has so acted, however the requirements of Article III remain. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41 n. 22, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976). The 1984 amendments to the Federal Communication Act, by explicitly providing for a private right of action, would most reasonably be considered as expanding standing. The protection of the satellite industry would be realized in the 1984 amendment of the substantive right in § 605(a) and the provision of specific exemptions in § 605(b). The court in *Starlink* therefore should have proceeded with standard standing analysis, instead of solely relying on the discerned protectionist intent and the remarks of Senator Goldwater.

In *American Television and Communications Corporation v. Floken, Ltd.,* 629 F.Supp. 1462 (M.D.Fla.1986), the standing issue was squarely addressed and decided in favor of the plaintiff cable company. In *Floken* the plaintiffs, including a cable company similar to Quincy, sought damages and injunctive relief against a number of defendants, including hotels and motels which were using satellite dish antannae to intercept satellite programming intended to be received and redistributed by the plaintiff cable company. The court, in addressing the issue of whether the plaintiff cable company had standing, considered constitutional and prudential limitations on standing as well as the amended statute, and ruled that the plaintiff cable company was an "aggrieved party" and thus had standing. *Id.* at 1469–72.

■ After careful consideration of the parties' arguments at hearing and in their memoranda, this Court concludes that, as with the cable company in *Floken,* Quincy Cablevision has standing to sue the defendants under § 605(a), (d). The plaintiff Quincy satisfies the standing requirements even if the additional prudential limitations are applicable. Quincy clearly has a personal stake in the outcome of the controversy and has suffered "injury in fact." Defendants' unauthorized interception and use of the NESN transmissions will likely deprive Quincy of customers. As this Court stated in its memorandum of August 6, 1986, "Quincy loses an unascertainable number of potential customers for the retransmission of NESN programming each time a defendant exhibits the programs in his tavern." *Quincy Cablesystems, Inc. v. Sully's Bar, Inc.,* 640 F.Supp. 1159, 1161 (D.Mass.1986). In effect, Quincy has a proprietary interest in the NESN satellite transmissions. *See Floken,* 629 F.Supp. at 1471. A similar finding was made in *American Television and Communications Corp. v. Western Techtronics,* 529 F.Supp. 617, 621 (D.Colo.1982). American Television and Communications ("ATC") held the right to distribute Home Box Office ("HBO") programming to the Denver area, and paid for that right. ATC provid-

ed its fee paying subscribers with special equipment to receive HBO transmissions. Defendants sold equipment to enable their customers to receive the HBO programming without having to pay ATC a subscription fee. The court ruled that ATC's "proprietary interest is sufficient to confer standing on ATC to object to the theft of HBO programming...." *Id.* at 621. *See also Entertainment and Sports Programming Network, Inc. v. Edinburg Community Hotel,* 623 F.Supp. 647, 651 (S.D.Tex. 1985) (consent decree) (the contractual right of a plaintiff cable company to distribute satellite transmissions of the transmission senders, ESPN and HBO, is a "proprietary interest" sufficient to confer standing on the cable company). Moreover, Quincy's claimed injury is likely to be redressed by a favorable decision of this Court.

Furthermore, Quincy's claims are arguably within the zone of interests intended to be protected by § 605. Section 605 protects radio communications from unauthorized reception, use, and retransmission. Quincy, as a cable system operator, has significant economic and professional interests in the integrity of the communications systems. *See Floken,* 629 F.Supp. at 1471. This Court agrees with the statement of the court in *Floken* that "[t]he harm to programming services, such as ESPN and HBO, is in part derivative, since they usually receive fees from subscribers through local distributors.... Thus, the greatest immediate impact from unauthorized reception is on local distributors...." *Id.* at 1471. Consequently, § 605 can be understood—from the language of the provision and its context in the statute—as granting persons in Quincy's position a right to judicial relief.

The legislative history of § 605(d), however, is contradictory on the issue of whom Congress intended to have a right to judicial relief. As noted above, the *Starlink* decision rested primarily on Senator Goldwater's statement during floor debate on the Act that "aggrieved person" excluded

those entities which possess limited rights of reception and retransmission to the programming, such as cable systems. *Starlink,* 601 F.Supp. at 1572. The court in *Floken,* on the other hand, cited the official legislative history, reported by Senator Packwood, which states that

> Under subsection (3)(A) [of § 605], the term "any person aggrieved" shall be broadly interpreted by the courts in such cases and shall include those with any rights in the intercepted radio communications. Such persons would include but are not limited to, owners of the programming being transmitted as well as senders of the signal embodying the programming transmitted. Thus, the Committee amendment provides an explicit right of action for any person aggrieved by the violations of Section 705(a) [47 U.S.C. § 605(a)].

*Floken,* 629 F.Supp. at 1472 (quoting 1984 U.S.Code Cong. & Admin.News 4655 at 4750). Thus, Senator Packwood states that "aggrieved person" includes those with "any rights" in the intercepted radio communications, whereas Senator Goldwater asserts that the language excludes those with "limited rights," such as cable companies. This court finds the remarks of Senator Packwood more persuasive because they are consistent with the breadth of the statutory language "any person aggrieved," they are part of the officially reported legislative history, and their effect is consistent with the general purpose of the amendments of protecting transmissions from unauthorized interception. The prudential limitations on standing are therefore satisfied. In summary, plaintiff Quincy has standing to bring suit against defendants under the Federal Communications Act, 47 U.S.C. § 605(a), (d). Defendants' motion to dismiss Count One should therefore be denied.

## II. *Lanham Act*

In Count Two, NESN alleges that the defendants have violated the Lanham Act,

15 U.S.C. § 1125.[2] Specifically, in paragraph 29 of the complaint NESN alleges a Lanham Act violation on the basis that

> Each Defendant has violated 15 U.S.C. § 1125 in that each Defendant has intentionally and falsely described and represented that NESN's programming services were lawfully obtained and that the Defendants were authorized to receive such programming and provide it to their customers and thus to receive tangible and intangible benefits from their customers by virtue of their display and exhibition.

Defendants argue that Count Two must be dismissed for failure to state a claim upon which relief can be granted. It is well-settled that in deciding a 12(b)(6) motion the allegations in the complaint are taken as true. *See Carr v. Learner,* 547 F.2d 135, 137 (1st Cir.1976).

The First Circuit has explained that the basis for an action under the Lanham Act, § 1125, is "use of a mark in interstate commerce which is likely to cause confusion or to deceive purchasers concerning the source of goods." *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.,* 567 F.2d 154, 160 (1st Cir.1977). *See also Salomon/North America, Inc. v. AMF Incorporated,* 484 F.Supp. 846, 849 (D.Mass. 1980) ("Because defendants' advertisement does not deceive the public as to the source of the goods, I rule that plaintiff has not established a reasonable likelihood of success on the merits of its Lanham Act claim."). The validity of the statement in *Quabaug* was thrown into doubt in *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 493 & n. 5 (1st Cir.1981). In *Pignons,* the court of appeals stated that it expressed no opinion

on the issue of whether—despite the statement in *Quabaug* quoted above—section 1125(a) "encompasses mere false advertising." In *Pignons,* Pignons, a photographic equipment manufacturer, asserted claims under the Lanham Act, alleging, among other things, that some of the photographs purported in Poloroid's advertisements to have been taken with SX–70 film were in fact taken with special cameras using special film. *Id.* at 492. The court in *Pignons* held that "Pignons has not ... demonstrated that it can show any likelihood of damage from Poloroid's supposedly false claims concerning SX–70 film." The court also stated that there was no evidence in the record to suggest that Poloroid's color quality claims—even if false—could cause a prospective purchaser of Pignons' camera to switch to Poloroid. *Id.* at 493.

In a connected case, *Pignons S.A. de Mecanique v. Polaroid Corp.,* 701 F.2d 1 (1st Cir.1983) (dismissal on grounds of collateral estoppel), the First Circuit succinctly summarized § 1125(a) as making it "unlawful 'falsely to describe or represent' goods in commerce, and gives a cause of action to 'any person who believes that he is or is likely to be damaged by the use of any such false description or representation.'" *Id.* at 2. The related *Pignons* case thus also indicates that the scope of § 1125 may extend beyond using a mark that is likely to cause confusion as to the source of the goods.

In *Purolator, Inc. v. EFRA Distributors, Inc.,* 687 F.2d 554 (1st Cir.1982), the Court of Appeals for the First Circuit further explained purpose and nature of § 1125(a). The court stated that

> Section 43(a) [§ 1125(a)] of the Lanham Act provides a remedy for those dam-

**2.** Section 1125(a) states:

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

aged by a "false designation of origin" by a competitor. 15 U.S.C. § 1125(a). This section creates a federal statutory tort broader in scope than the common law of unfair competition and the law of infringement. [citation omitted]. It is designed to reach, among other things, attempts to appropriate the goodwill associated with a competitor's trademark by means of confusingly similar marking and packaging, which would create the impression that the products of the defendant originated with the plaintiff. Again, a showing that the marks or packaging of defendant create a likelihood of confusion with the products of the plaintiff will be a key to establishing a claim of false designation of origin.

*Id.* at 560–561. Thus, the case law of the Court of Appeals for the First Circuit indicates that to make out a violation of § 1125, NESN must either allege that defendants are deceiving their patrons as to the source of the programming, or that defendants have made false claims regarding the NESN programming which have directly injured NESN.

Defendants argue that NESN fails to state a claim under § 1125 because there has been no allegation that defendants deceive their patrons as to whose program is being provided for viewing. NESN, on the other hand, argues that the essence of the Lanham Act claim is defendants' false representations that the NESN programming viewed in defendants establishments were legally obtained and authorized. NESN asserts that the only source from which defendants could lawfully obtain the NESN programming was Quincy, and thus, NESN maintains that in effect defendants misrepresent the source of the programming. NESN cites as authority for its position *Entertainment and Sports Programming Network, Inc. v. Edinburg Community Hotel, Inc.,* 623 F.Supp. 647 (S.D.Texas 1985) (consent decree). The court in that case stated that defendant, "by falsely inferring [sic] [implying] and describing that the entertainment programming services of the plaintiffs HBO and ESPN were paid for and lawfully obtained, ... has unfairly

competed with Plaintiffs ESPN and HBO." *Id.* at 655. The court in *Edinburg Community Hotel* in turn relied on several cases that held that a false representation as to the defendant's authorized status to provide the plaintiffs services or lawful affiliation with plaintiff constituted unfair competition. *See* cases cited *id. See, e.g., Kentucky Fried Chicken Corporation v. Diversified Packaging Corporation,* 549 F.2d 368, 385 (5th Cir.1977).

 The cases of the First Circuit, however, apply § 1125 more narrowly than the cases cited by plaintiff. The defendants have not acted to deceive their patrons that NESN is in fact the source of the programming shown in defendants' establishments, nor have the defendants made false claims regarding the NESN programming that directly injure NESN. The gist of a § 1125(a) action lies in the likelihood of confusion to the public which would have the effect of appropriating the goodwill associated with the competitor's trademark and products. *See Purolator,* 687 F.2d at 560–61. In this case plaintiffs do not assert that consumers are likely to confusedly associate NESN or its programming with defendants' companies or products. *See Pignons,* 657 F.2d at 492.

A recent case, *Production Contractors, Inc. v. WGN Continental Broadcasting Co.,* 622 F.Supp. 1500 (N.D.Ill.1985) presented circumstances similar to the case presently before this Court. The plaintiff, Production Contractors, Inc. ("PCI"), organized and promoted a McDonald's Charity Christmas Parade. PCI sold exclusive television broadcast rights in the parade for the Chicago area to the American Broadcasting Company ("ABC"). ABC's local affiliate was WLS–TV. Defendant WGN–TV intended to telecast the parade on its own, simultaneously with WLS. The court ruled that copyright protection of the telecast of the parade did not prevent WGN's live telecast of the parade. *Id.* at 1505. In addressing the Lanham Act claim, the court stated,

In the present case, PCI's conclusory statement that WGN's telecast of the parade will necessarily create the false impression that WGN is somehow connected with PCI falls far short of establishing likelihood of confusion and the secondary meaning associating PCI with the parade, which is a necessary basis for any public confusion. *Id.* at 1504–1505. The court's rejection of plaintiff's Lanham Act claim highlights the attenuated and remote nature of the misrepresentation which plaintiff alleges in the present case. NESN's Lanham Act claim, Count Two of the complaint, should be dismissed for failure to state a claim upon which relief may be granted.

### III. *Tortious Interference with Contract*

Defendants next argue that plaintiffs fail to state a claim of tortious interference with contract, and therefore that Count Five of the complaint must be dismissed. In Count Five both plaintiffs allege that defendants have tortiously interfered with contracts between Quincy and program suppliers, including NESN, and between Quincy and its subscribers. The plaintiffs allege that the value of these various contracts has been diminished by defendants interception and retransmission of the programming.

To state a claim in Massachusetts for the tort of interference with contractual relations, the plaintiffs must establish that defendants committed

> (1) intentional and wilful acts (2) calculated to cause damage to the plaintiffs in their lawful business, (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendant, (which constitutes malice), and (4) actual damage and loss resulting.

*Chemawa Country Golf, Inc. v. Wnuk,* 9 Mass.App. 506, 509, 402 N.E.2d 1069 (1980) (*quoting Walker v. Cronin,* 107 Mass. 555, 562 (1871)); *Kazmaier v. Wooten,* 761 F.2d 46, 51 (1st Cir.1985). This interference may either be with a particular contract, or prospective contractual relations. *Chema-*wa, 9 Mass.App. at 509–510, 402 N.E.2d 1069 (citing Restatement (Second) of Torts § 766B (1979)). Count Five adequately describes contractual relations between Quincy and NESN, and between Quincy and its subscribers. The interference must be intentional to be tortious, *Chemawa, supra,* and plaintiffs have satisfactorily alleged that defendants had knowledge of the contracts or relationships with which they are allegedly interfering.

Defendants stress that *Chemawa* held that in its classic form the tort of interference with contractual relations involves the undoing of a business arrangement bound by contract or in its extended form inducing a third person not to enter into or continue a business relation. The court in *Chemawa,* although making these assertions, relied on a broader formulation. *Id.* at 509, 402 N.E.2d 1069. In setting out the four elements of the tort, see *supra,* the court stated that the fourth element was a showing of "actual damage and loss resulting" from the intentional and wilful acts of the defendant. *Id.* The court in *Chemawa* further explained that "[i]t is also the essence in an action for wrongful interference with contractual relationships that the plaintiff suffer damages as a consequence of the defendant's conduct, and those damages cannot be speculative or conjectual losses." *Id.* at 510, 402 N.E.2d 1069. In *Chemawa* the court ruled that the plaintiff failed to make out the elements of the tort because there was no evidence that the plaintiff had suffered damages as a consequence of the defendant's conduct. *Id.* at 511, 402 N.E.2d 1069. There was no "disruption" of a particular contract nor any evidence which tied the loss to plaintiff of members of green fees to the defendant's unjustified conduct. *Id.* at 510–511, 402 N.E.2d 1069. The court in *Chemawa* concluded that plaintiff had established nothing other than that defendants conduct was "vexation" and "intensely irritating." *Id.* at 511, 402 N.E.2d 1069. In the present case, on the other hand, plaintiffs allege that defendant's conduct caused "diminition of the value" of their

various contracts. Thus, plaintiffs adequately allege actual damage and loss resulting from defendants' alleged conduct. Plaintiffs' claim for tortious interference with contract therefore should not be dismissed for failure to state a claim upon which relief can be granted.

### IV. *Interference with Advantageous Business Relations*

■ For the same reasons, defendants' motion to dismiss Count Six for failure to state a claim of interference with advantageous business relations should also be denied. The tort of interference with advantageous business relationships is an extension of the tort of interference with contractual relations. *See Chemawa,* 9 Mass. App. at 509–510, 402 N.E.2d 1069. The court in *Chemawa* cited with approval Restatement (Second) of Torts § 766B (1979) formulation of the elements of interference with prospective contractual relations. Section 766B states:

> One who intentionally and improperly interfers with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

The plaintiffs allege that defendants "interfered with Plaintiffs' potential contractual relationships with potential subscribers who would purchase the Plaintiffs services but for the availability of the programming at the Defendants' establishments." The plaintiffs also state in their complaint that "[e]ach Defendant has intentionally and maliciously interfered with the advantageous business relationships of the plaintiffs." As the recited averments show, contrary to defendants' assertions, plaintiffs have alleged that defendants had knowledge of the business relationships

and induced or caused a third person not to enter into those business relationships with plaintiffs. In short, plaintiffs have stated a claim for tortious interference with advantageous business relationships. *See Kazmaier,* 761 F.2d at 51–52; *Chemawa,* 9 Mass.App. at 509–510, 402 N.E.2d 1069.

### V. *Conversion*

#### A. Failure to State A Claim

■ Defendants argue that Count Seven, the claim for conversion, must be dismissed as to plaintiff Quincy on the grounds that none of Quincy's property is being received by the defendants. Conversion requires the exercise of dominion or control over the personal property of another. *Third National Bank of Hampden County v. Continental Insurance Company,* 388 Mass. 240, 244, 446 N.E.2d 380 (1983). The plaintiff must have had a present legal right to immediate possession of the property. *Lane v. Volunteer Co-operative Bank of Boston,* 307 Mass. 508, 514, 30 N.E.2d 821 (1940). Thus at the time of the alleged conversion, the plaintiff must have had either possession or right to immediate possession of the property converted. *Massachusetts Lubricant Corp. v. Socony-Vacuum Oil Co.,* 305 Mass. 269, 271, 25 N.E.2d 719 (1940). As discussed above regarding Quincy's standing under the Federal Communications Act, Quincy had a proprietary interest in the transmissions intercepted and redistributed by the defendants. NESN's programming transmissions were intended for direct receipt by Quincy. Quincy paid NESN for this exclusive right to receive and retransmit the signals. Quincy thus had a right to the "possession" of the transmissions. Quincy has thus sufficiently plead a claim for conversion.

#### B. Preemption

■ Defendant next argues that NESN's conversion claim must be dismissed on the grounds that it is preempted by the Copyright Act, 17 U.S.C. § 301(a).[3]

---

**3.** Section 301, 17 U.S.C. § 301, states in perti- nent part:

Section 301 sets out a two-part analysis for preemption. *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 723 F.2d 195, 199–200 (2nd Cir.1983), *reversed on other grounds,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Orth-O-Vision, Inc. v. Home Box Office,* 474 F.Supp. 672, 683–84 (S.D.N.Y.1979). A state cause of action is preempted if both parts of the Act's two part analysis are satisfied. First, the work of authorship in which rights are claimed must fall within the subject matter of copyright as defined in §§ 102 and 103 of the Act. Section 102(a)(6) makes "motion pictures and other audiovisual works" subject to copyright protection.[4] NESN's programming is made up of motion pictures and other audiovisual works, and thus is subject to copyright protection.

The second requirement for preemption, as set forth in § 301, is that the state law create "legal or equitable rights that are equivalent to any exclusive rights within the general scope of copyright as specified in section 106 of the Act." The court in *Harper & Row* explained the nature of this second inquiry.

When a right defined by state law may be abridged by an act which, in and of itself, would infringe one of the exclusive rights in question, the state law in question must be deemed preempted. [citations omitted]. Conversely, when a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur.

*Id.* at 200. The rights enumerated in § 106 are the rights of exclusive reproduction, performance, distribution and display.[5] The acts at issue in NESN's complaint are defendants' alleged reception of NESN's video signals and their presentation to defendants' patrons. NESN's conversion action seeks to protect rights of distribution, performance, and display. Those rights are already guarded by the Copyright Act.

---

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by section 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

 \* \* \* \* \*

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by Section 106.

4. Section 102, 17 U.S.C. § 102, states, in relevant part:

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Words of authorship include the following categories:

(1) literary works;

(2) musical works, including any accompanying words;

(3) dramatic works, including any accompanying music;

(4) pantomimes and choreographic works;

(5) pictorial, graphic, and sculptural works;

(6) motion pictures and other audiovisual works; and

(7) sound recordings.

5. Section 106 states, in relevant part:

Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, or choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and

(5) in the case of literary, musical, dramatic, or choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

The elements in plaintiff's action for conversion involve elements that would not establish qualitatively different conduct by the defendants than the elements for an action under the Copyright Act. Thus, there is equivalence between the state and federal rights. Plaintiff's conversion action is thus preempted. *See Harper & Row, supra,* (conversion action based on theory of unauthorized publication of manuscript preempted by Copyright Act); *Orth-O-Vision, supra,* (unfair competition claim involving performance and display of motion pictures and audiovisual works in form of HBO programming preempted by Copyright Act).

The decision in *Oddo v. Ries,* 743 F.2d 630 (9th Cir.1984), cited by plaintiff in its brief, is not to the contrary. In *Oddo* the court ruled that an action for conversion of papers comprising a manuscript involved actions different from those proscribed by the copyright laws, and thus was not preempted. *Id.* at 635. The theory of plaintiffs conversion action in *Oddo* was possession and control of tangible property. *Id.* (citing *Harper & Row*). In the present case, as also for the conversion action preempted in *Harper & Row,* however, the conversion action is based on a theory of unauthorized publication. In its brief, NESN asserted it made out a conversion action on the grounds that defendants' intercept NESN's signals intended for receipt only by Quincy, and then exhibit the NESN programming to their patrons without permission of payment of fees to either of the plaintiffs. Plaintiffs' Memorandum at 14. NESN thus seeks to vindicate rights equivalently protected by the Copyright Act, and as such, its conversion action is preempted.[6]

## VI. *Copyright Act*

The defendants move to dismiss Count Three, the Copyright Act claim, on grounds that NESN has failed to allege compliance with the statutory prerequisites to bringing a copyright infringement action. Specifically, the defendants argue that plaintiff's claim suffers from three defects: 1) failure to plead compliance with the registration requirement in 17 U.S.C. § 411(a);[7] 2) failure to plead that notice was given pursuant to 17 U.S.C. § 411(b)[8] to the extent the relevant works are fixed with their first transmission; and 3) failure to plead compliance with the recordation requirements of 17 U.S.C. § 205(d).[9]

Copyright registration under § 411(a) is a condition precedent to filing an infringement action. *See, e.g., Conan Properties, Inc. v. Mattel, Inc.,* 601 F.Supp. 1179, 1182 (S.D.N.Y.1984); *Milene Music, Inc. v. Gotauco,* 551 F.Supp. 1288, 1293 n. 7 (D.R.I.1982). As the court in *Conan Properties* stated, "[a]lthough recitation of the fact that copyrights have been

---

**6.** Both NESN and Quincy have brought claims for conversion. The defendants addressed their preemption argument to NESN, although its motion is to dismiss the whole of Count Seven. In view of the fact that the parties did not satisfactorily address the issue of preemption as to Quincy's claim for conversion, this Court will not address the issue here.

**7.** Under 17 U.S.C. § 411(a),

Subject to the provisions of subsection (b), no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title.

**8.** Section 411(b) states:

In the case of a work consisting of sounds, images, or both, the first fixation of which is made simultaneously with its transmission, the copyright owner may, either before or

after such fixation takes place, institute an action for infringement ... if ... the copyright owner—(1) serves notice upon the infringer, not less than ten or more than thirty days before such fixation, identifying the work and the specific time and source of its first transmission, and declaring an intention to secure copyright in the work; and (2) makes registration for the work within three months after its first transmission.

**9.** Section 205(d) states:

No person claiming by virtue of a transfer to be the owner of a copyright or of any exclusive right under a copyright is entitled to institute an infringement action under this title until the instrument of transfer under which such person claims has been recorded in the Copyright Office, but suit may be instituted after such recordation on a cause of action that arose before recordation.

registered appears to be a mere technicality, it is a prerequisite to the court's jurisdiction." *Id.* at 1182. The complaint in this case does not allege compliance with the copyright registration requirements. Accordingly, the motion to dismiss the copyright infringement claim should be granted. However, since there has been no showing that correction of the defect at this time would prejudice defendants, dismissal should be ordered without prejudice to plaintiff's filing an amended or supplemental complaint which relates back to the commencement of the action, within 20 days of the filing of this memorandum. *See, e.g., Conan Properties*, 601 F.Supp. at 1182; *Charron v. Meaux*, 60 F.R.D. 619, 624 (S.D.N.Y.1973). Any defect in the original complaint as to plaintiff's failure to comply with the requirements of § 411(b) and § 205(d) may be similarly cured in the amended or supplemental complaint. *See Meta-Film Associates, Inc. v. MCA, Inc.*, 586 F.Supp. 1346, 1351–1352 (C.D.Cal.1984) (plaintiffs filing with the Copyright Office subsequent to filing complaint cured the initial § 205(d) defect); *Northern Songs, Ltd. v. Distinguished Productions*, 581 F.Supp. 638, 641 (S.D.N.Y.1984) ("[C]ourts have consistently permitted a plaintiff to correct a defective recordation, and to go forward with the suit as of the date of the filing of the action.").

Order accordingly.

## ORDER

In accordance with memorandum filed this date, it is ORDERED:

1. Defendants' motion to dismiss Count One (47 U.S.C. § 605) as to plaintiff Quincy Cablesystems, Inc. ("Quincy") is denied.

2. Defendants' motion to dismiss Count Two (Lanham Act 15 U.S.C. § 1125) as to plaintiff New England Sports Network ("NESN") is allowed.

3. Defendants' motion to dismiss Count Five (Tortious Interference with Contract) as to both Quincy and NESN is denied.

4. Defendants' motion to dismiss Count Six (Interference with Advantageous Business Relationships) as to both Quincy and NESN is denied.

5. Defendants' motion to dismiss Count Seven (Conversion) as to Quincy is denied.

6. Defendants' motion to dismiss Count Seven as to NESN is allowed.

7. Defendants' motion to dismiss Count Three (Copyright) as to NESN is allowed, without prejudice. Leave is granted to NESN to file an amended or supplemental complaint to cure the jurisdictional defects of its Copyright Act claim within twenty days of the filing of this opinion.