838 F.2d 249
 SIOUX FALLS CABLE TELEVISION, a partnership, Appellant,
v.
STATE OF SOUTH DAKOTA; South Dakota Board of Charities and
Corrections; Ted Spaulding; Lyle Swenson;
Carole Hillard; Frank Brost; Dr.
Michael Rost; and Herman
Solem, Appellees.
South Dakota Community Television Assoc., Amicus/Appellant.
 No. 86-5479.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 12, 1987.
Decided Jan. 29, 1988.
Rehearing and Rehearing En Banc Denied April 1, 1988.
 
 Rick W. Orr, Sioux Falls, S.D., for appellant.
 Frank Geaghan, Asst. Atty. Gen., Pierre, S.D., for appellees.
 Before McMILLIAN and JOHN R. GIBSON, Circuit Judges, and MURPHY,* District Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Sioux Falls Cable Television appeals from an order of the district court[1] denying its request for an injunction prohibiting the State of South Dakota, the South Dakota Board of Charities and Corrections, and six named South Dakota officials from intercepting copyrighted satellite signals and retransmitting them to the individual cells of inmates at the state penitentiary. Sioux Falls Cable Television v. State of South Dakota, No. 86-4022, slip op. at 9 (D.S.D. Nov. 19, 1986). The primary issue presented by this appeal is whether the district court was correct in holding that the State's interception and retransmission fall within the "private viewing" exception of the Cable Communications Policy Act of 1984, Sec. 705(b), 47 U.S.C. Sec. 605(b) (Supp. III 1985). We affirm the judgment of the district court.
 
 
 2
 The parties have stipulated to most of the relevant facts, and the remainder were presented in a court trial held on September 23, 1986.
 
 
 3
 Sioux Falls Cable is the local distributor of cable television programming in the Sioux Falls area and acquires exhibition and performance rights from program providers such as Home Box Office (HBO) and Entertainment and Sports Programming Network (ESPN). These programs are received by satellite antenna and are generally broadcast to subscribers through coaxial cable. Sioux Falls Cable may also authorize individuals to receive programming directly by satellite antenna. For these services, subscribers pay a monthly fee based on the number of channels they receive; Sioux Falls Cable in turn pays the program providers a fee based on the number of its subscribers. The South Dakota State Penitentiary is within the franchise area of Sioux Falls Cable.
 
 
 4
 For a time, Sioux Falls Cable was providing its cable service to the penitentiary. The service was provided through an inmate group, the Granite City Jaycees, who were responsible for collecting fees from the individual inmate subscribers. The Jaycees then paid Sioux Falls Cable a fee based on the total number of subscribers. This system created regulatory and extortion problems within the penitentiary, however, and it was discontinued for that reason.
 
 
 5
 On October 10, 1985, the State installed an eight-foot satellite dish receiving station at the penitentiary. The dish and its supporting equipment were purchased with money from what is known as the commissary fund. That fund consists of the profits from all inmate purchases of commissary goods. The fund is maintained for the benefit of the inmates, and it is typically used to purchase entertainment and recreational goods. While inmates may make suggestions as to how the fund should be spent, all expenditures must be approved by prison officials.
 
 
 6
 The penitentiary's dish is programmed to receive six channels. The signals are fed into a bank of six receivers or modulators, passed through an amplifier, then retransmitted into the inmates' individual cells. Unlike the previous system, all inmates have access to the programming free of charge. This method of providing inmates with cable programming has eliminated the problems experienced under the previous system. Cable viewing gives inmates something to do with their time, and this is an aid in maintaining order at the prison.
 
 
 7
 In January of 1986, Sioux Falls Cable filed an action in federal district court alleging violations of 47 U.S.C. Sec. 605(a) and seeking a permanent injunction prohibiting the State from using the satellite dish and supporting equipment at the prison. The State argued that these activities were authorized by the "private viewing" exception of section 605(b). The district court denied Sioux Falls Cable's motion for summary judgment and the case was tried to the court on September 23, 1986. On November 19, 1986, the district court entered judgment in favor of the State, Sioux Falls Cable, slip op. at 9, and this appeal followed.
 
 
 8
 Before proceeding to the main issue in this case, we must first consider whether Sioux Falls Cable has standing to bring this action. Section 605(d)(3)(A) provides a private right of action for "any person aggrieved by any violation of [section 605(a) ]." The State argues that because Sioux Falls Cable is merely a local cable distributor, it is not a "person aggrieved" within the meaning of the statute. Citing Air Capital Cablevision, Inc. v. Starlink Communications Group, Inc., 601 F.Supp. 1568, 1570-72 (D.Kan.1985), the State argues that only a sender or originator of intercepted communications, such as ESPN or HBO, is a "person aggrieved" under section 605(d).
 
 
 9
 The standing doctrine "involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1978). Because standing is an element of federal subject matter jurisdiction, id. at 498-99, 95 S.Ct. at 2204-05, it may be raised as an issue at any time, Fed.R.Civ.P. 12(h)(3). We believe that Sioux Falls Cable has satisfied the constitutional standing requirements. Sioux Falls Cable has alleged that it pays for the right to receive and distribute cable programming in the Sioux Falls area and thus has a significant proprietary interest in the satellite signals. Sioux Falls Cable also contends that the State's actions have deprived them of potential customers and fees. Sioux Falls Cable has therefore shown that they have personally suffered some actual or threatened injury, resulting from or fairly traceable to the State's alleged illegal action, which is likely to be redressed by the injunctive relief they seek. These allegations are sufficient to meet the requirements of Article III. See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758-59, 70 L.Ed.2d 700 (1982).
 
 
 10
 We also believe that Sioux Falls Cable has satisfied the "zone of interests" test, which is sometimes invoked as a prudential limitation on federal jurisdiction.[2] The statute provides a right of action for "any person aggrieved" by an alleged violation of section 605(a). Where agency action is not involved, this is ordinarily sufficient to confer standing on any party satisfying the constitutional requirements. See, e.g., Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 209, 93 S.Ct. 364, 366-67, 34 L.Ed.2d 415 (1972). In addition, this construction is consistent with the breadth of the "any person aggrieved" language and section 605(a)'s general purpose of protecting cable transmissions from unauthorized interception. See Quincy Cablesystems, Inc. v. Sully's Bar, Inc., 650 F.Supp. 838, 844 (D.Mass.1986); American Television and Communications v. Floken, 629 F.Supp. 1462, 1471-72 (M.D.Fla.1986). Cf. DeLoss v. Dept. of Housing & Urban Development, 822 F.2d 1460, 1463 (8th Cir.1987) (test satisfied if plaintiff's asserted interest has "plausible relationship" to "general policy" implicit in relevant statute (quoting Securities Industry, 107 S.Ct. at 759, 757 & n. 14)). Finally, this interpretation is supported by the official legislative history of section 605(d)(3)(A). See 130 Cong.Rec. S14,286 (daily ed. Oct. 11, 1984) (statement of Sen. Packwood), reprinted in 1984 U.S.Code Cong. & Admin.News 4655, 4750, quoted in Quincy, 650 F.Supp. at 844; Floken, 629 F.Supp. at 1472. To the extent that Starlink, supra, is inconsistent with this analysis, we believe the factual situation in that case is readily distinguishable from that involved here, and in any event we find the reasoning of the Starlink court unpersuasive. We hold that Sioux Falls Cable has standing to bring this action.[3]
 
 
 11
 Next we consider whether the State's interception and retransmission of cable programming fall within the "private viewing" exception of section 605(b). The main purpose behind the enactment of section 605(b) was to "[make] it clear that the manufacture, sale and home use of earth stations are legal activities." 130 Cong.Rec. H10,446 (daily ed. Oct. 1, 1984) (statement of Rep. Rose). Section 605(b) provides:
 
 
 12
 The provisions of subsection (a) of this section shall not apply to the interception or receipt by any individual, or the assisting (including the manufacture or sale) of such interception or receipt, of any satellite cable programming for private viewing if--
 
 
 13
 (1) the programming involved is not encrypted; and
 
 
 14
 (2)(A) a marketing system is not established under which--
 
 
 15
 (i) an agent or agents have been lawfully designated for the purpose of authorizing private viewing by individuals, and
 
 
 16
 (ii) such authorization is available to the individual involved from the appropriate agent or agents; or
 
 
 17
 (B) a marketing system described in subparagraph (A) is established and the individuals [sic] receiving such programming has obtained authorization for private viewing under that system.
 
 
 18
 Section 605(c)(4) defines "private viewing" as "viewing for private use in an individual's dwelling unit by means of equipment, owned or operated by such individual, capable of receiving satellite cable programming directly from a satellite * * *."
 
 
 19
 We believe the district court was correct in holding that the State's interception and retransmission of cable television programming, in the unique circumstances of this case, satisfy the requirements of section 605(b), and are therefore exempt from the prohibitions of section 605(a). We discuss each of these requirements separately.
 
 
 20
 Section 605(b) requires that the programming involved not be encrypted, and that a marketing system for the authorization of private viewing not be established. 47 U.S.C. Sec. 605(b)(1), (2)(A). The district court found that none of the programming involved in this case is encrypted, and Sioux Falls Cable does not challenge this finding on appeal. They argue, however, that a marketing system for the programming has been established. Sioux Falls Cable offered evidence that it was the local agent authorized to act for program providers in granting permission to satellite dish owners to intercept cable programming and that it offers its services to the public. See 47 U.S.C. Sec. 605(b)(2)(A)(i), (ii).
 
 
 21
 The district court interpreted section 605(b)(2) to mean that the marketing system must be established by "those that have the proprietary interest in that which is being intercepted or received." 1984 U.S.Code Cong. & Admin.News at 4747. Thus, "the marketing system must be established by the programmers themselves, not by the distributors." In the district court's view, no such system was pleaded or proven in this case.
 
 
 22
 While we are not in agreement with the district court's conclusion in this respect, we are satisfied for different reasons that Sioux Falls Cable has failed to prove that an appropriate marketing system was established. The statute requires establishment of a marketing system "under which--(i) an agent or agents have been lawfully designated for the purpose of authorizing private viewing by individuals, and (ii) such authorization is available to the individual involved from the appropriate agent or agents * * *." 47 U.S.C. Sec. 605((b)(2)(A). Our study of the record convinces us that in this case the second condition has not been satisfied, and we therefore affirm the judgment of the district court. Cf. Katter v. Arkansas Louisiana Gas Co., 765 F.2d 730, 734-35 (8th Cir.1985) (appellate court may affirm on any ground supported by record, even though not directly addressed in court below).
 
 
 23
 It is apparent from the record that penitentiary officials exercise control over the inmates' right to receive cable television broadcasts. Initially, as found by the district court, Sioux Falls Cable was providing its service to the inmates through an inmate group, the Granite City Jaycees, who were responsible for collecting fees from the individual inmate subscribers. This group in turn paid Sioux Falls Cable. In the agreement between the inmate group and Sioux Falls Cable, the penitentiary played the part of a guarantor, allowing the Jaycees to enter into the contract. The penitentiary for some time had problems with this arrangement. There were regulatory problems, extortion problems, and things that the penitentiary had no control over because an inmate group was in charge. This system was discontinued and replaced by the satellite dish. No one has argued that the State exceeded the bounds of its authority in doing so; it was stipulated that the purpose of cancelling the agreement and installing the satellite dish was to eliminate these internal problems. See Goff v. Nix, 803 F.2d 358, 362 (8th Cir.1986) (quoting Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979)), reh'g denied, 809 F.2d 530, cert. denied, --- U.S. ----, 108 S.Ct. 115, 98 L.Ed.2d 73 (1987). Moreover, no evidence was offered that the inmates could have set up the dish on their own. Implicit in this record is the control which the penitentiary system and penitentiary authorities necessarily exercise over the inmates' right to receive cable service. The penitentiary setting is therefore a limitation on the availability of authorization "to the individual involved from the appropriate agent or agents" under section 605(b)(2)(A)(ii). It is not merely inconvenient, impractical, or costly, but legally impossible for the inmates to subscribe to cable at the prison by themselves. For this reason, we affirm the district court's judgment that Sioux Falls Cable has failed to prove the establishment of an appropriate marketing system.
 
 
 24
 Sioux Falls Cable argues, however, that the State's actions have resulted in a "private cable system," involving the interception and retransmission of cable signals, which the language of the statute and its legislative history prohibit. See Floken, 629 F.Supp. at 1469; ESPN v. Edinburg Community Hotel, Inc., 623 F.Supp. 647, 652 (S.D.Tex.1985). The cable company points out that section 605(b) exempts "any individual" who intercepts or receives satellite cable programming, or assists such interception or receipt, for private viewing. They argue that the term "individual" cannot be read to include a large group of inmates viewing cable programming in their individual cells by means of a single satellite dish. In their estimation, such a construction would permit groups of individuals in other institutions, such as hotels, apartment complexes, and college dormitories, to use a satellite dish and supporting equipment to retransmit cable television programming to numerous individual rooms. They conclude that the State has exceeded the scope of section 605(b) by assisting the inmates in setting up this system.
 
 
 25
 Our study of the record and the authorities cited by the parties satisfies us that the arrangement at the South Dakota penitentiary is not the sort of "private cable" or "satellite master antenna television" system which Congress intended to exclude from the private viewing exception. 1984 U.S.Code Cong. & Admin.News at 4749-50, quoted in Floken, 629 F.Supp. at 1469. In reaching this conclusion we may concede, although we need not and do not decide, that Sioux Falls Cable's position would prohibit hotels, apartment complexes, college dormitories, and the like from providing cable to their occupants without paying a fee. For the reasons set forth below, we believe the situation at the penitentiary is exceptional and calls for a reading of the statute narrowly tailored to these facts.
 
 
 26
 First, we do not believe that the benefits which the State derives from cable programming are of the sort with which Congress was primarily concerned in excluding "private cable" systems from section 605(b). All of the examples which Sioux Falls Cable points to involve cable systems set up either for direct financial gain, in that the proprietor of the system may charge for its use or enjoyment, or for indirect financial gain, in the sense that the availability of the system is an attraction to potential occupants or customers of the establishment, be it an apartment complex, a hotel, a dormitory, a bar, or a mobile home park. In this case, however, the State does not provide cable service for its own financial gain, direct or indirect. The district court found that the State derives no direct financial benefit from the system, and it is evident that attraction of potential occupants or customers is hardly a factor in the availability of cable television in the cells of a penitentiary. No claim was made that the system is used by anyone other than the inmates, and the benefit they receive in viewing cable is no different from that received by any other person in his or her private dwelling unit. The district court did find that the cable system is an aid in maintaining order at the prison, but this is not a benefit to the State of such an economic or financial nature as to run afoul of the private viewing exception. Because of the unique situation in the penitentiary, we do not believe the State has created the sort of "private cable" system which Congress intended to exclude from section 605(b). See 1984 U.S.Code Cong. & Admin.News at 4749-50.
 
 
 27
 Second, in other institutions it is generally feasible to charge the individual for the use of cable service. The district court found that the penitentiary attempted to implement an individual user charge, but that the system created various regulatory and extortion problems which required it to be abandoned.[4] We accord state prison officials wide-ranging deference in their adoption and execution of policies and practices that they determine are necessary to preserve internal order. Goff, 803 F.2d at 362. There was no evidence in the record to indicate that the state officials had "exaggerated their response" to this situation, and we therefore defer to the State's judgment, as adopted by the district court, that the individual user charge was unworkable. See id. In our view, this provides an additional reason for concluding that the State's actions fall within the private viewing exception. We do not believe that exception should be read to require prison officials to reconsider or resume a practice which they have found disruptive.
 
 
 28
 Finally, we agree with the district court that the private viewing exception must be given a practical and common sense interpretation. Sioux Falls Cable has conceded that if each inmate owned or operated his own dish, then the programming would be intercepted and received "by an[ ] individual" within the meaning of section 605(b). Although we may not find facts, we observe that the State has argued, without contest, that equipping each cell with a satellite dish and supporting equipment would be virtually impossible. Moreover, the district court's finding that an individual user charge was not only unworkable, but in fact disruptive, indicates that the State has come as close as it reasonably can to implementing a conventional "private viewing" system. In these circumstances, we do not believe section 605(b) should be interpreted to require more.
 
 
 29
 We conclude that the present case is distinguishable from those cited by Sioux Falls Cable, in which individuals set up a cable system for direct or indirect financial gain, and in which use of an individual payment scheme or equipment would be feasible. We hold that the penitentiary's system should not be excluded from the private viewing exception merely because the inmates view cable programming by means of a single satellite dish, and that the State has not exceeded the bounds of section 605(b) merely by assisting them in setting up such a system.
 
 
 30
 Section 605(c)(4) states that the viewing must be "for private use in an individual's private dwelling unit." Sioux Falls Cable argues that an inmate's cell can hardly be considered a private dwelling place, because it is open to inspection by State officials at any time and it is not "a place where generally the persons present are within the normal circle of a family or [friends]." 1984 U.S.Code Cong. & Admin.News at 4749. Alternatively, Sioux Falls Cable contends that even if we accept that the inmate's individual prison cell is his private dwelling unit, the legislative history nonetheless clearly shows congressional intent to exclude from the "private viewing" exception groups of individuals who receive satellite programming from a single satellite dish.
 
 
 31
 The district court found that cable programming is not available in the prison's common areas, but only in the inmates' individual cells. The court also found that generally the only person present in a cell is the inmate. These findings are supported by the record, and in our view they are sufficient to sustain the district court's conclusion: be they ever so humble or austere, those individual cells are the only private dwelling places the inmates can enjoy. The cable company's alternative argument is merely another way of framing its position that the State has created a private cable system. For the reasons set forth above, we do not believe this argument should apply here.
 
 
 32
 Section 605(c)(4) also requires that the equipment used by an individual in his or her private dwelling unit be "owned or operated" by that individual (emphasis added). The district court found that the money to purchase the satellite dish system came from the commissary fund, which is generated by inmates' purchases and is earmarked to be used for the benefit of the inmates. The court reasoned that while no inmate can take an interest in the system with him when he leaves the penitentiary, "it is clear that the inmates collectively are the equitable owners of the system." The court concluded that this was sufficient to satisfy the "owned or operated" requirement of the private viewing exception.
 
 
 33
 Sioux Falls Cable does not contest the district court's factual findings. They argue, however, that the findings are insufficient to prove equitable ownership. They contend that the State alone determines whether and how the equipment is to be used, and that the inmates, neither individually nor collectively, have any property rights in the equipment that they can assert against the State. Thus, the argument runs, the satellite dish and equipment are owned and operated by the State.
 
 
 34
 With the limited issues involved in this case, we need not dwell on the niceties of the inmates' property interests in the cable equipment. We view that as primarily a question of fact, and on this record we cannot say that the district court was clearly erroneous in its conclusion that the inmates, having contributed the money to purchase the satellite dish, retain some interest in the system, be it equitable ownership or not. Fed.R.Civ.P. 52(a). Further, we are satisfied that the inmates "operate" the equipment within the meaning of section 605(c)(4). The district court found that the inmates are the system's sole users and do all of the work necessary to maintain the system. The district court's findings are supported by the record, and in our view they are sufficient to satisfy the "owned or operated" requirement.
 
 
 35
 Having considered and rejected all of the arguments raised by Sioux Falls Cable on this appeal, we hold that in the unique circumstances of this case the State's interception of satellite signals and retransmission into the inmates' individual cells falls within the "private viewing" exception of 47 U.S.C. Sec. 605(b).
 
 
 36
 The judgment of the district court is affirmed.
 
 
 37
 McMILLIAN, Circuit Judge, dissenting.
 
 
 38
 I respectfully dissent. I believe that the district court erred in holding that the State's interception and retransmission of cable television programming into individual prison cells comes within the "private viewing" exception of Sec. 605(b). Accordingly, I would reverse the judgment of the district court and remand the case for further proceedings.
 
 
 39
 I believe the majority misinterprets the language and legislative history of Sec. 605(b) in arriving at its decision. The legislative history of Sec. 605(b) indicates that Congress intended to create a very limited and strictly conditioned exception to the broad prohibitions of Sec. 605(a). 1984 U.S.Code Cong. & Admin.News, 4655, 4747-48. Section 605(b) permits the interception or receipt of satellite cable television programming for private viewing if (1) the programming involved is not encrypted and (2) a marketing system has not been established. Section 605(c)(4) defines the term "private viewing" to mean "viewing for private use in an individual's dwelling unit by means of equipment, owned or operated by such individual, capable of receiving satellite cable programming directly from a satellite...." The State's interception and retransmission of cable signals into individual prison cells does not fulfill any of the requirements of Secs. 605(b), (c)(4). Each of these requirements is considered below.
 
 Individual
 
 40
 The "private viewing" exception exempts individuals from the prohibitions of Sec. 605(a). The district court and the panel majority broadly construe the term "individual" to include a large group of inmates viewing the cable television programming in their individual cells by means of a single satellite dish. This construction would permit groups of individuals in other institutions, such as hospitals and college dormitories, to use a satellite dish and supporting equipment to retransmit cable television programming to numerous individual rooms. Obviously, this is not what Congress had in mind in enacting the "private viewing" exception.
 
 
 41
 Although there are no reported cases dealing with the meaning of the term "individual" within the "private viewing" exception, a number of cases have considered the exception as applied to hotels and motels. In American Television and Communications v. Floken, 629 F.Supp. 1462, 1463-64 (M.D.Fla.1986), cable television programmers, owners and operators obtained a preliminary injunction preventing hotel and motel owners from intercepting and retransmitting, without authorization, cable television programming into guest rooms. The district court held that such a use was not "private viewing":
 
 
 42
 The "private viewing" exception was created to protect individual owners of backyard earth stations and their suppliers. Defendants' use of satellite dishes to provide satellite cable programming for their hotel/motel guests without payment of subscription fees, and for their own commercial advantage does not fall within the "private viewing" exception. This conclusion is mandated not only by the language of the statute, but also by the legislative history. According to the legislative history, the drafters of the bill neither contemplated nor intended that the "private viewing" exception include private cable systems....
 
 
 43
 Id. at 1469; accord, ESPN v. Edinburg Community Hotel, Inc., 623 F.Supp. 647, 652 (S.D.Tex.1985) (retransmission to hotel rooms was not "private viewing").
 
 
 44
 The district court distinguished the above cases from the present case on the basis that the State is not receiving financial gain from its operation of the satellite dish. The majority likewise found the absence of any financial gain or benefit to the State to be significant. Although I agree that there is no financial gain to the prison, in the sense of increased profits resulting from an increase in "customers" as with a hotel or motel, there is a financial benefit to the State. The cable system, as the district court found, is an aid in maintaining order at the prison and is received free of charge. The prison thus receives a benefit for which others in the franchise area of Sioux Falls Cable must pay a fee.
 
 
 45
 Even if I were to assume, however, that the receipt of cable services by prison inmates does not result in a financial benefit to the State, I would nonetheless hold that the State's reception and retransmission are prohibited by Sec. 605(a). The legislative history indicates that the prohibitions of Sec. 605(a) do not apply only to those who are receiving financial gain. 1984 U.S.Code Cong. & Admin.News at 4741. Commercial advantage or financial gain is not relevant in determining if Sec. 605(a) has been violated, but is relevant in determining criminal penalties and treble civil damage awards. See 47 U.S.C. Sec. 605(d)(2), 605(d)(3)(C)(ii).
 
 Private Dwelling Unit
 
 46
 Section 605(c)(4) states that the viewing must be "for private use in an individual's dwelling unit." The legislative history provides further guidance as to what is meant by "dwelling unit."
 
 
 47
 The term "private viewing" is intended to describe a situation whereby an individual purchases or otherwise acquires satellite receiving equipment and uses such equipment to receive satellite cable programming which he [or she] views within his [or her] private dwelling place. The "individual's dwelling place" is a place not open to the public. It is a place where generally the persons present are within the normal circle of a family or its social acquaintances.
 
 
 48
 1984 U.S.Code Cong. & Admin.News at 4749. For example, the Senate Report states that "an individual's dwelling unit includes a vacation home, an individual's mobile home unit (but not a mobile home park), an individual's recreational motor home vehicle or boat which is designed with sleeping accommodations for no more than a few people." Id. at 4741. Even if I were to accept, as the majority does, that the inmate's individual prison cell is his or her private dwelling unit for the period of his or her imprisonment, the legislative history nonetheless clearly shows congressional intent to exclude from the "private viewing" exception groups of individuals who receive satellite programming from a single satellite dish. I believe that a prison is similar to a mobile home park, which is expressly excluded from the "private viewing" exception in the legislative history. Thus, I conclude that Congress did not intend to include inmates' cells in a prison within the definition of a private dwelling place.
 
 Ownership of the Equipment
 
 49
 Section 605(c)(4) further requires that the equipment used by an "individual" in his or her "dwelling unit" be owned or operated by such individual. In the present case, the State concedes that it is the legal owner of the satellite dish and supporting equipment but argues that the inmates are the equitable owners.
 
 
 50
 I believe that the district court clearly erred in determining that the inmates were the equitable owners of the satellite dish and equipment.[1] Admittedly, the satellite dish and equipment were bought with funds generated by inmate commissary purchases, however, without more, this is insufficient to constitute equitable ownership. Inmates did not "contribute" funds to purchase the satellite dish and other equipment, as the majority asserts. Rather, inmates purchased items from the commissary and the profits from the sales went into a commissary fund, which the State at its discretion used for the inmates' benefit. The State alone determined that monies from the commissary fund would be used to purchase the satellite dish and equipment and the State alone determines whether and how the equipment is to be used. The inmates, neither individually nor collectively, have any property rights they can assert against the State. Thus, the satellite dish and equipment are owned and operated by the State and not by the individuals viewing the cable television programming, as required by the "private viewing" exception.
 
 Retransmission of the Signals
 
 51
 The legislative history makes clear that the "private viewing" exception does not permit the reception, amplification and retransmission of cable television programming to other dwelling units or residences.
 
 
 52
 [I]t is not intended that "private viewing" include any retransmission by so-called "private cable" or "satellite master antenna television" systems. Nor is it contemplated that an individual may redistribute programming received by his satellite equipment to the homes or residences of his neighbors.
 
 
 53
 1984 U.S.Code Cong. & Admin.News at 4749-50. The State admitted that the system includes an eight-foot satellite dish, a bank of six receivers, six modulators and an amplifier which retransmits signals to each inmate's individual cell. The prison has, in effect, set up a private cable system that retransmits cable television programming and thus the State's actions do not come within the "private viewing" exception.
 
 Established Marketing System
 
 54
 The "private viewing" exception is only applicable[2] if a marketing system has not been established for the authorization of private viewing. Sec. 605(b)(2)(A). Sioux Falls Cable offered evidence that it was the local agent authorized to act for program providers such as HBO and ESPN in granting permission to satellite dish owners to intercept cable programming and offers its services to the public. Sec. 605(b)(2)(A)(ii), (i). The State did not dispute this evidence.
 
 
 55
 The majority concludes, however, that Sioux Falls Cable failed to prove that an appropriate marketing system was established because prison officials did not permit inmates to subscribe to cable television programming on an individual basis. I must disagree. The availability of authorized cable service, within the meaning of Sec. 605(b)(2)(A), does not depend on whether inmates may contract for cable service. It is undisputed that Sioux Falls Cable offers its cable services to prison inmates and in fact had provided cable service to the inmates before the State installed its satellite dish. Sioux Falls Cable stands ready to provide these services again to prison inmates for a fee--this is what this lawsuit is all about.
 
 
 56
 The majority stresses the internal problems which the prison officials encountered when an inmate group was responsible for collecting fees from individual inmate subscribers and the deference to be paid to prison officials' decisions to discontinue this system. Such considerations, however, are not relevant to the question of the availability of authorized cable service through an established marketing system; the propriety of the State's decision to terminate the earlier cable service contract is not at issue. The only question is whether authorized cable service through a marketing system is available. Clearly, the only limitation on the availability of cable services to prison inmates is that imposed by the State itself. Ironically, the State has, perhaps for legitimate reasons, prohibited inmates from contracting directly with Sioux Falls Cable and now justifies its interception and retransmission of cable television programming on the basis that this prohibition makes authorized cable service unavailable to the inmates.
 
 
 57
 Even if I accept for argument purposes that the infeasibility of providing cable services to inmates on an individual fee basis makes authorized cable service unavailable, within the meaning of the statute, I do not believe the State has established infeasibility. At best the State has demonstrated that one system--inmate collection of fees--resulted in internal problems which made the system unworkable. However, there was no evidence that other systems were tried or even considered. One thus must wonder why the individual subscription fees could not be collected by prison officials, instead of inmates, if this was the source of the internal problems.
 
 Conclusion
 
 58
 I recognize, as does the majority, that there are unique problems involved in providing inmates access to cable television services. The prison's desire to circumvent these problems and at the same time to provide cable services as an aid to maintaining order and as a recreational benefit to inmates does not outweigh Sioux Falls Cable's right to receive fees for cable services. Congress in Sec. 605(a) has expressly prohibited the unauthorized reception of cable television programming. An individual or entity, no matter how laudable the motives, may not receive or retransmit cable services without authorization unless the receipt of the services comes within the private viewing exception of 605(b). The State's receipt and retransmission of cable signals does not come within this exception. Thus, I would reverse the district court and remand for further proceedings consistent with this opinion.
 
 
 
 *
 The HONORABLE DIANA E. MURPHY, United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 The Honorable John B. Jones, United States District Judge for the District of South Dakota
 
 
 [2]
 The Supreme Court has recently reexamined and reformulated the "zone of interests" test as an aspect of the reviewability of agency action under the Administrative Procedure Act, 5 U.S.C. Sec. 702 (1982), leaving the applicability of the test to other express private rights of action somewhat in doubt. Clarke v. Securities Industry Ass'n, --- U.S. ----, 107 S.Ct. 750, 758 n. 16, 93 L.Ed.2d 757 (1987). See also DeLoss v. Dept. of Housing & Urban Development, 822 F.2d 1460, 1463 & n. 3 (8th Cir.1987). Our analysis indicates that Sioux Falls Cable has standing under any articulation of the prudential standing requirements
 
 
 [3]
 In view of our ultimate disposition of this appeal, we find it unnecessary to further refine the scope of our jurisdiction to take account of the 11th amendment. See generally Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)
 
 
 [4]
 There was testimony that prison officials did not believe it would be feasible for them to collect fees from the inmates. Not all inmates could afford to buy the service, and only those with the money or using extortion would get it. The penitentiary officials were also concerned that they were not intended to play the role of bill collectors with indigent inmates, and it would be cost-prohibitive for the penitentiary to hire someone to administer the program and collect the fees for them. Tr. of Court Trial at 18, 20, 21, 23
 
 
 [1]
 My analysis similarily leads me to conclude that the inmates do not "operate" the equipment within the meaning of Sec. 605(c)(4)
 
 
 [2]
 The "private viewing" exception is also not applicable if the programming is encrypted. 47 U.S.C. Sec. 605(b)(1). This is not an issue in this case